CAROLINAS COTTON GROWERS AS-
SOCIATION, INC., Plaintiff,

v.

C. Horace ARNETTE, Defendant.

CAROLINAS COTTON GROWERS AS-
SOCIATION, INC., Plaintiff,

v.

C. J. ROLLINS, Defendant.

CAROLINAS COTTON GROWERS AS-
SOCIATION, INC., Plaintiff,

v.

Craig STEPHENS, Defendant.

CAROLINAS COTTON GROWERS AS-
SOCIATION, INC., Plaintiff,

v.

Gurnie ROWELL, Defendant.

Civ. A. Nos. 73–1400, 73–1401, 73–1447,
73–1448.

United States District Court,
D. South Carolina,
Florence Division.

Jan. 22, 1974.

C. Weston Houck and Brown W. Johnson, Florence, S. C., William H. McCullough, Raleigh, N. C., for plaintiff. ·

William J. McLeod, Marion Kinon, Charles E. Curry, Dillon, S. C., Jacob H. Jennings, Bishopville, S. C., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW and ORDER

CHAPMAN, District Judge.

These four actions were tried before the Court without a jury on January 7, 1974. Testimony previously taken on November 12, 1973 and November 19, 1973 at hearings on motions for temporary injunctions was made a part of the record by consent of counsel, as well as all answers to interrogatories and exhibits introduced and received into evidence.

The plaintiff is a North Carolina corporation, chartered as an agricultural cooperative, and seeks specific performance of contracts with each of the defendants covering cotton to be grown by said defendants during the 1973 crop year. These contracts are known in the trade as "forward contracts", since they are made in the spring at or before the planting of the cotton crop, and establish the price to be paid to the farmer for his cotton when it is harvested in the fall. Such contracts have become common in recent years, since they allow a farmer to know in advance the price he will receive for his cotton, and determine whether it is economically wise for him to spend the time and money necessary to plant, cultivate and produce his crop. It relieves the farmer of the worry of a decrease in cotton prices from the time of planting until the harvest.

This marketing arrangement has advantages to the textile manufacturer. since it thereby knows the raw material cost six to eight months before harvest and delivery of the cotton. The mutual benefits to the grower and the manufacturer have caused widespread adoption of "forward contracting".

These contracts usually cover acres of cotton to be planted and not bales to be produced. However the customary, historic and usual number of bales produced on a given farm is a fairly constant figure, unless there is some unexpected flood, drought or other natural disaster.

The present actions are the result of an unprecedented rise in the price of domestic cotton from approximately $.30 per pound to $.80 or $.90 per pound between the spring and the fall of 1973. This has been the fastest rise and to the highest price known in more than a century. Suits for specific performance of cotton contracts have been brought throughout the southeastern part of the United States, but unfortunately the language seems to differ in the contracts used by the parties, and no cases have been found in which "liquidated damages" are provided using the same language appearing in the contracts between the present plaintiff and the defendants.

After the hearings of November 12 and 19, 1973, this Court issued its Order of December 4, 1973 enjoining and restraining the defendants from selling or otherwise disposing of any of their 1973 cotton crop pending the trial and final Order of the Court. Each defendant was directed to continue to harvest, gin, bale and otherwise process the cotton

mentioned in the contract with the plaintiff and store said cotton in a suitable and proper warehouse, immediately advising the plaintiff of the number of bales harvested, the number of acres of cotton that have not yet been harvested, the location of such bales, the number of bales harvested, ginned and stored subsequent to the date of the Order, and the plaintiff was required to post a bond or letter of credit in the amount of $50,000.00 to cover any damages defendants may suffer as a result of the injunction.

Now that the Court has heard, received and considered all of the evidence and has reviewed the excellent briefs submitted by the attorneys, it is necessary for the Court to state its findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. The plaintiff Carolinas Cotton Growers Association, Inc. is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in Raleigh. It was originally created under the name of North Carolina Cotton Growers Cooperative Association, but its name was changed in 1964. On March 30, 1961, the plaintiff qualified to do business in the State of South Carolina and was domesticated by action of the Secretary of State. Since that time it has been engaged in business in South Carolina conducting various activities authorized by its charter, including the purchasing and sale of cotton. The plaintiff is a non-profit cooperative established under North Carolina G.S. § 54–129 et seq., which is similar to the South Carolina Cooperative Marketing Act, Section 12–901 et seq. South Carolina Code of Laws 1962.

2. The defendant C. J. Rollins is a citizen and resident of Lee County, South Carolina and the defendants Gurnie Rowell, E. H. Arnette and Craig Stephens are all citizens and residents of Dillon County, South Carolina.

3. On March 1, 1973, the plaintiff and the defendant Rollins entered into an agreement entitled "Special Marketing Contract (1973 Crop)" whereby Rollins agreed to sell and the plaintiff agreed to purchase all of Rollins cotton crop consisting of 50 acres. The contract provided in part:

"Association agrees to make advance on Producer's cotton from the gin of Producer's choice. Payment in all instances by Association to Producer is based on net warehouse weights.

Producer hereby agrees that the Association shall have authority and power to obtain a Government loan on the security of the cotton purchased from him by the Association, to pledge the cotton and to give a lien thereon, and to sell such cotton.

At the time of receiving by the Association of Producer's 1973 cotton crop, the Association agrees to advance Producer 30¢ per pound on all grades and staples with a mike of 3.4 and higher. All bales classed grassy will be reduced 2¢ per pound. All bales with mike of 3.3 or lower will be reduced 2¢ per pound. The above terms cover all gradable cotton ginned on or before December 15, 1973, after which date all gradable cotton will be received at 750 points over 1973 Government loan rates. All below grade bales will be received at 19¢ per pound regardless of gin date.

.    .    .    .    .    .

Producer agrees to practice normal, good farming methods in the production and harvesting of the crop, to defoliate before machine picking and to harvest, gin and store as fast as practicable after maturity."

4. The contract also contained the following paragraph regarding liquidated damages, which language has been one of the basic causes of controversy between the parties:

"It is agreed between Producer and Association that the sum of $25 per bale shall be taken to be the liquidated damages of Association in the event

that Producer shall fail to perform his promises and covenants faithfully under this Contract, that sum being hereby agreed upon by Producer and Association as being as nearly as possible the actual damage which Association will suffer in the event of Producer's failure to perform. It is further agreed that said sum expressly is liquidated damages and not a penalty."

5. On March 3, 1973, the plaintiff and defendant Gurnie Rowell entered into a contract covering 150 acres of his cotton to be produced in Dillon County, and on March 5, 1973 contracts were entered into between the plaintiff and defendant Arnette covering his cotton crop on 90 acres in Dillon County and between the plaintiff and defendant Craig Stephens covering his cotton crop on 50 acres in Dillon County.

6. The terms of the individual contracts are the same except for the names of the producer, the county and the number of acres involved. Each defendant contends that the contract provision as to liquidated damages represents the plaintiffs' exclusive remedy in the event of breach and that the plaintiff may not specifically enforce the contract. The plaintiff seeks specific performance as an alternate remedy, contending that it is authorized under the Uniform Commercial Code, the Cooperative Marketing Act and general case law.

7. At the time the four contracts were executed the 1973 cotton crop had not been planted by any of the defendants and this is typical of a forward contract in the cotton farming and marketing business.

8. Prior to negotiating the contracts with the defendants the plaintiff had contacted Fieldcrest Mills, Inc., a large textile manufacturing corporation in Eden, North Carolina and agreed to acquire cotton for Fieldcrest on a forwarding contract basis from farmers in North and South Carolina producing a grade of cotton with a fiber length of one and one-sixteenth (1 1/16) and one and three-thirty-secondths (1 3/32) inches,

which was needed by Fieldcrest in its manufacture of towels, sheets, pillowcases and other textile products.

Fieldcrest Mills, Inc. sells a large volume of its output to Sears Roebuck and Co. and J. C. Penney & Co., two of the largest retail merchants in the United States, both of which companies use mail order catalogs in their business. These catalogs must be printed and the prices set long before the towels, sheets and other articles are received from Fieldcrest or even manufactured by Fieldcrest. This requires Fieldcrest to sell its production many months in advance, at a price agreed upon at the time of sale and not at the time of delivery. In order to do this Fieldcrest must know far in advance the cost of its cotton, the basic raw material from which the cloth is made.

9. Under the agreement between the plaintiff and Fieldcrest the contracts with the defendants were assigned to Fieldcrest by the plaintiff on March 13, 1973. The contracts were re-assigned to the plaintiff after certain defendants had sold a part of their crop on the open market or had otherwise indicated that they would not abide by the agreements signed by them in March 1973. The plaintiff is now the owner and holder of the contract with each defendant.

10. Forward contracting of cotton is one of the methods used by the plaintiff to assist its farmer members in selling their cotton. Another method is a pool arrangement where farmers prefer to put their cotton production into a pool with other farmers and then allow the plaintiff to sell the entire pool at the best possible price. Profits from these pool arrangements are divided among the participating farmers. The pool arrangement is subject to the fluctuations in the price of cotton on the open market. The present defendants did not choose to join a pool or subject themselves to a possible decrease in the price of cotton between the time of planting and the time of harvest. They chose the forward contract as hereinabove de-

scribed. The cost to the plaintiff in handling the forward contract is covered by a fee of $2.50 per bale paid by the mill purchasing the cotton, Fieldcrest, in the present cases. No commission or other expenses are charged against the farmer by the plaintiff.

11. Following the execution of the contracts each of the defendants planted cotton on the acreage described. At the time of the November 19 hearing, defendant Stephens indicated that he expected 55 to 60 bales, defendant Arnette expected 75 to 80 bales, defendant Rowell had sold on the open market 103 bales, had 24 bales at the gin and approximately 20 bales unpicked in the fields, while the defendant Rollins had sold 26 bales on the open market, had 3 bales in the plaintiff's warehouse and approximately 15 bales either ginned or unpicked in the field.

12. Between March and October 1973, the price of cotton rose more rapidly and to a higher point than at any time since the year immediately following the close of the War Between the States. This market gyration was caused by many factors, foreign and domestic, which need not be discussed at this time. The cotton which was selling at $.30 to $.32 per pound in March was bringing $.80 to $.90 per pound in September and October. Documents were introduced showing the average price received by farmers in the United States for upland cotton (the type involved herein) from 1960 through February of 1973. These figures indicate that cotton prices have fluctuated over the period from an average cost of 32.8 cents per pound in 1961 to 20.6 cents per pound in 1966, however the fluctuations within a given year were much smaller, amounting to only a few cents per pound, either up or down. In some years the price decreased between the time of planting and the time of harvest, so that farmers selling on a forward contract were protected from a drop in the market.

13. The average bale of cotton weighs approximately 500 pounds and the past performance of the defendant's acreage indicates that a yield of approximately one bale per acre could be expected.

14. Each of the defendants was a member of· the plaintiff association at the time of the execution of the contracts and at the time of the trial of these actions. A membership certificate had been issued to each defendant as follows: Gurnie Rowell, February 26, 1965, No. B80006; Horace Arnette, December 12, 1965, No. B80021; C. J. Rollins, December 9, 1968, No. D40148; and Craig Stephens, January 23, 1969, No. B80070. The membership certificate certifies that the person named thereon is a member of the cooperative association entitled to all of the rights and privileges thereof and bound by and subject to the obligations and conditions pertaining thereto. Certificates of membership are non-transferrable and a farmer must become a member before he may do business with the plaintiff or sell his crops through the plaintiff. The membership fee is only $1.00 and confers membership upon the farmer for a period of ten years.

15. The plaintiff publishes a magazine which is mailed to all of its members. This magazine not only contains agricultural information and articles useful to the farmer, but is also used to advise the farmer members of the time and place and purpose of meetings of the membership, procedure for election of directors, publication of annual financial statements and other information that is usually furnished to stockholders by a corporation.

16. Although the defendants deny knowing that they were members of the plaintiff, the record shows that each was a member and each had dealt with the plaintiff in the past in the sale of cotton. Arnette had delivered 79 bales under a similar contract with the plaintiff in 1972. Rowell had entered into a marketing agreement with the plaintiff for the year 1972 and delivered his cotton in accordance therewith. Stephens had

sold his cotton to the plaintiff in 1969 and Rollins had sold under similar contracts in 1971 and 1972.

17. Each of the defendants has refused to deliver the cotton representing their 1973 crop from the acreage covered by the contracts to the plaintiff in this action and some of the defendants have sold bales from the 1973 crop to other parties. The plaintiff has been damaged as a result of defendants' breaches of their contracts, however, the amount of the damage cannot be determined until the information required by this order is received.

## CONCLUSIONS OF LAW

A. The Court has jurisdiction of this matter under 28 U.S.C. § 1332 because of diversity of citizenship between the plaintiff and the defendant in each case and also the amount in controversy in each case exceeds $10,000.00. The defendant Rollins contends that since he has only 15 to 18 bales of cotton left in his possession or under his control, having sold 26 bales prior to the bringing of this action, the amount involved as to him does not exceed $10,000.00. However, the contract called for all of the cotton produced by defendant Rollins from his 50 acres, the value of which at the time suit was brought would exceed $10,000.00 and he may not escape the jurisdiction of the Court by selling a large portion of his crop in violation of the terms of the contract.

B. The contracts between the plaintiff and each of the defendants represent valid and binding agreements and require the defendants to deliver in the fall that which they sold in the spring. The intention of the parties to the contract is plain and adequately set forth in the written agreement. Although these contracts contain a provision for liquidated damages, and this provision caused the Court concern, since it was different from or not included in other cotton contracts, the Court is convinced and so concludes that it does not allow the defendants to pay the liquidated damages and void the contracts in question. The provision as to liquidated damages does not indicate that it is the exclusive remedy in the event of breach or default and Section 2–719(1)(b) of the Uniform Commercial Code adopted by the State of South Carolina as 10.2–719(1)(b) of South Carolina Code of Laws, 1962, as amended, provides:

"(1)(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."

The official comment on this section states:

"Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, it must be clearly expressed."

There is no statement in the present contract that the paragraph regarding liquidated damages is intended to be the exclusive or only remedy of the plaintiff in the event of breach. The import of the contract is indicative of the intention that the contract be performed.

C. A great deal of time could be spent in discussing whether cotton as a commodity is so unique as to be the proper subject of an action for specific performance. Numerous District Court decisions in the last few months seem to indicate that cotton contracts may be specifically enforced at the present time due to the unusual interdependency of the various persons handling cotton from the time of its planting, through its sale, manufacture and delivery to the ultimate consumer. However, it is not necessary to discuss the common law requirements of specific performance in view of the Cooperative Marketing Act of South Carolina which provides statutory authority for specific performance of agricultural marketing contracts. Section 12–973 of the Code of Laws of South Carolina, 1962 provides:

"In the event of any such breach or threatened breach of such marketing

contract by a member the association shall be entitled to an injunction to prevent the further breach of the contract and to a decree of specific performance thereof."

■ D. The defendants assert that this provision of the Cooperative Marketing Act is not available to the plaintiff since it is a North Carolina corporation and 12–902(3) defines the term "Association" as "any corporation organized under this chapter." The plaintiff corporation was not organized under the South Carolina Cooperative Marketing Act, but by domesticating in South Carolina and qualifying to do business in this state, it became entitled to use the laws of the State relating to agricultural marketing cooperatives and to enforce its contracts by specific performance as authorized in Section 12–973. To deny this right to the plaintiff, after it has been domesticated and permitted to do business in South Carolina would be a denial of the equal protection of the laws and in violation of the Fourteenth Amendment to the Constitution of the United States.

■ E. As a non-profit agricultural marketing cooperative the plaintiff is not required to prove all of the elements usually necessary to justify specific performance when it is attempting to enforce a marketing contract with one of its own members. The reason for this is best explained in North Carolina Cotton Growers' Cooperative Ass'n., Inc. v. Bullock, 191 N.C. 464, 132 S.E. 154, 155–156 (1926):

". . . When he (the grower) has contracted that he will not dispose of his crop in this manner, he should regard it no hardship if he is required to abide by the written word. If we should uphold the contention that the defendant had a legal right to sell his entire crop on the open market, though at the demand of the lien holder, the effect would be the practical nullification of the marketing agreement.

The plaintiff was organized as a non-profit, cooperative association for the purpose of marketing cotton and removing or diminishing the danger of a speculative control of the price at which cotton should be sold in the market; and, as said, in Co-op Ass'n. v. Jones, supra [185 N.C. 265, 117 S. E. 174], the plaintiff's existence is dependent on the enforcement of the contract made with its members. If by any kind of indirection the contract may be disregarded, the business of the association will come to an end."

■ F. The defendants are members of the plaintiff association and as such are subject to specific performance of their marketing contracts as provided in Section 12–973. The defendants do not contend that they were coerced or improperly persuaded to sign the contracts in March 1973. Having signed a contract which clearly requires them to deliver their 1973 cotton crop, they must comply.

G. The language of the contract is careful to point out that the liquidated damage provision shall be considered as liquidated damages and not as a penalty. This results from the different effect of liquidated damages and penalties under contract law, but does not indicate any intention that liquidated damages shall be the exclusive remedy of the plaintiff. The distinction between liquidated damages and penalties is explained in Tate v. Le Master, 231 S.C. 429, 99 S.E.2d 39 as:

"Whether such a stipulation is one for liquidated damages or for a penalty is, of course, primarily a matter of the intention of the parties. Implicit in the meaning of 'liquidated damages' is the idea of compensation; in that of 'penalty', the idea of punishment. Thus, where the sum stipulated is reasonably intended by the parties as the predetermined measure of compensation for actual damages that might be sustained by reason of nonperformance, the stipulation is for liquidated

damages; and where the stipulation is not based upon actual damages in the contemplation of the parties, but is intended to provide punishment for the breach of the contract, the sum stipulated is a penalty.

If it be clear that the stipulation is for liquidated damages, breach of the contract will generally entitle the offended party to retain or recover the sum stipulated, and neither more nor less, without proof of damage actually sustained; but the language used by the parties is not conclusive of the question of whether the stipulation is for liquidated damages or for penalty.

. . . . . .

If the provision be for a penalty, recovery is measured not by the sum stipulated, but by the amount of actual damage proven to have been sustained as a result of the breach."

■ ■ Liquidated damages are legal and enforceable upon proof of the violation of the contract and without proof of the damages actually sustained. This is because the sum stipulated is intended by the parties to reasonably determine the damages. See Kirkland Distributing Company of Columbia, S. C. v. United States, 276 F.2d 138 (4th Cir. 1960). Penalties for breach of a contract are not as readily enforceable because they are considered arbitrary amounts not related to the actual damages sustained. In the present contract the amount of $25 per bale represents approximately five cents per pound and would normally be sufficient to cover damages resulting from a farmer's breach, since the fluctuation between planting and harvest of the cotton crop rarely amounts to more than a few cents per pound. However, this does not indicate an intention that such damages shall be the exclusive remedy in the event of breach.

H. In view of the provisions of the Cooperative Marketing Act it is unnecessary for the Court to discuss or decide other issues raised by the parties such as irreparable damage claimed by the plaintiff, uniqueness of cotton, alleged damage to the public, the status of the plaintiff as a broker or merchant and whether the Uniform Commercial Code changes the common law rules of specific performance. It is also unnecessary to decide whether the plaintiff was acting as a cooperative at the time of the contract or as an agent for Fieldcrest Mills, since the Cooperative Marketing Act authorizes the various actions of the plaintiff at Section 12–923. The plaintiff is entitled to specific performance of these four contracts and the plaintiff insists that those defendants having sold cotton subject to these contracts should be required to replace such cotton by purchasing cotton of the same quality, staple and grade and delivering it to the plaintiff. The Court is not ready to order the defendants to purchase and deliver bales of cotton to cover those sold in breach of the contracts, until additional information is available. Also, it may be cheaper for the plaintiff, which is required to minimize its damages, to arrange for such a purchase, since its experience, contacts, knowledge of the market and buying power may put it in a position to buy such bales more cheaply than individual farmers. This question will be left open until receipt of the information hereinafter ordered.

It is, therefore, ordered that the defendants E. Horace Arnette, J. C. Rollins, Craig Stephens and Gurnie Rowell forthwith deliver to the plaintiff Carolinas Cotton Growers Association, Inc. all of the cotton produced on the acreage covered by their respective contracts of March 1973; that delivery shall be made in accordance with the terms of said contracts and payment made by the plaintiff as set forth therein; that any cotton not yet harvested shall be harvested and ginned as soon as weather permits and delivery made to the plaintiff as provided in the contracts; that within five days from the receipt of this Order the four defendants through their respective attorneys shall file with this Court a certificate, under oath, with copies to the attorneys for the plaintiff, advising the Court of the exact number

of bales produced on the lands covered by the contract, the number of bales sold to third persons and the price per pound and total price received therefor, the number of bales and/or warehouse receipts for bales presently in the possession or under the control of the defendants, any cotton or bales presently at a gin or in the process of ginning or stored without warehouse receipts and the number of acres and estimated amount of cotton presently unpicked.

It is further ordered that this Court shall retain jurisdition of this case for the purpose of determining any damages resulting to the plaintiff as a result of the breach of the contracts and the sale of cotton by the defendants to third persons. A time for receiving evidence on the question of damages will be set by the Court after receiving the certificates mentioned above.

And it is so ordered.