17314

JAMES F. TATE, Plaintiff-Respondent, v. H. G. LEMASTER, Defendant-Appellant

(99 S. E. (2d) 39)

430

*Arnold R. Merchant, Esq.,* of Spartanburg, *for Appellant,*

*Claude R. Dunbar, Esq.,* of Spartanburg, *for Respondent,*

June 24, 1957.

LEGGE, Justice.

In an action to recover the sum of five hundred ($500.00) dollars paid by the plaintiff to the defendant in a transaction relating to the purchase and sale of real estate, plaintiff obtained a verdict for that amount, with interest; and the defendant appeals.

Except for (1) respondent's check evidencing the payment, and (2) appellant's receipt therefor, the transaction between the parties was verbal; and the evidence as to its terms was, to say the least, conflicting. It appears undisputed that appellant owned and resided on a tract of some twenty-three acres in Spartanburg County, known as Mimosa Lake. He kept the lake stocked with fish, and rented to all comers the right to fish therein. Among his customers was the respondent, whose version of the transaction between them is set forth in his amended complaint substantially as follows:

On November 5, 1955, defendant offered to sell the Mimosa Lake property to plaintiff for $11,000.00, agreeing to give the plaintiff through November 10, 1955, to decide whether or not he would take it, and also agreeing that plaintiff should make a "down payment" of $500.00, which would be refunded in the event that he should decide not to take the property and should so inform the defendant on November 10. Plaintiff made said "down payment"; and thereafter, having decided not to take the property, went to the

defendant's home on the morning of November 10 to so inform him, and, finding no one there, went again on the following day and then and there informed the defendant that he would not take the property, and asked for the return of his $500.00. Defendant did not at that time refuse to return the money, but merely told plaintiff that he would see him later. Thereafter, following another visit from the plaintiff, defendant on or about November 26, 1955 informed the plaintiff that, having had legal advice, he had decided to consider their trade closed and the money forfeited. Plaintiff alleged that by reason of these facts defendant was indebted to him in the amount of $500.00, with interest from November 11, 1955; and judgment in that amount was prayed.

The defendant's version is set forth in his amended answer as follows:

"1. That the defendant offered to sell to the plaintiff the property described in the Complaint for the sum of Eleven Thousand ($11,000.00) Dollars and that the plaintiff agreed to purchase the said property and to pay therefor the sum of Eleven Thousand ($11,000.00) Dollars and to bind the trade the plaintiff paid to the defendant, the sum of Five Hundred ($500.00) Dollars to be applied to the purchase price of the property or to be forfeited to the defendant if the plaintiff failed to comply with his contract to purchase the said property.

"2. That the defendant gave to the plaintiff a receipt for the Five Hundred ($500.00) Dollars at the time the trade was consummated. That the said receipt is made a part of this Answer as fully and as completely as it is copied in full herein. That the defendant has at all times been ready and willing to comply with the terms of the contract to sell and has acquainted the plaintiff with such facts. The plaintiff notified the defendant that he was not going to comply with the terms of his contract and told the defendant that he, the plaintiff, knew that he was forfeiting the Five Hundred ($500.00) Dollars that he had paid to the defendant to bind

the contract. The plaintiff further stated to the defendant that he knew that under the law he could not collect the Five Hundred ($500.00) Dollars he had paid or any part thereof."

The prayer of the answer is that the complaint be dismissed with costs, "and that the Five Hundred ($500.00) Dollars heretofore paid to the defendant by the plaintiff be declared by the Court as forfeited to the defendant, and for such other and further relief as to the Court may seem just, equitable and proper."

The respondent's check, in evidence, is in the amount of $500.00, dated November 5, 1955, and payable to the order of the appellant. It bears the payee's endorsement, and is perforated as paid by the drawee bank under date November 7, 1955. The receipt in evidence, dated November 5, 1955 reads:

"Received of J. F. Tate 500 and No/100 Dollars.

"Down Payment on Mimosa Lake.

"H. G. LeMaster"

It appears that respondent, having learned that the property was for sale, went there with his wife on Saturday, November 5, 1955. To quote from his testimony:

"Q. When you and your wife got back down at the lake, who did you find in the yard? A. We found him.

"Q. You mean the defendant? A. That's right.

"Q. What conversation took place there? A. I asked him what he asked for it. He said '$12,000.00.' I said, 'Wouldn't you take eleven thousand from me?' He says, 'I might do it'. Well, I says, 'Look give me till Thursday night to make up my mind, and I'll give you a 500-dollar check and if I decided to keep the place, keep it. But if I don't by Thursday night—I'll check and see if I can buy the place—and if not, you give me my check back.' He says, 'That's fine'."

Respondent testified further, that following the conversation just mentioned he and his wife and appellant went into the latter's house, where were appellant's wife and a younger

couple (appellant's son and daughter-in-law); that they "laughed and talked", and that respondent told appellant that if he should decide to take the place he could not take it over until March, and would like appellant to stay there until then; that he told appellant he "would let him know by Thursday"; and that he then gave appellant his check and was given the receipt before mentioned, which had been written by the young man. To quote further:

"Q. Mr. Tate, was there any further conversation relative to this matter that you can recall that you have not stated, on this first occasion of November 5, 1955? A. Well, nothing any more than I can remember I asked him to hold the place for me until Thursday night and I would give him a down payment of $500.00 check and if I decided not to take it, he would give it back to me Thursday.

\* \* \*

"Q. What did he say after you told him you wanted to do that? A. He said sure, he would give it back to me. It would be fine.

"Q. Now, Mr. Tate, when was it that you said that you had, until what day, to let him know? A. Thursday.

"Q. Was that the Thursday following November 5? A. Following, yes sir."

Respondent's testimony with regard to the transaction of November 5 was corroborated by that of his wife. So far as it concerned agreement between him and appellant that he should have until the following Thursday (November 10) in which to decide whether or not to take the property, and that should he decide not to take it and so notify appellant on or before November 10 his payment of $500.00 would be refunded, it was flatly contradicted by the testimony of appellant and his wife, his son, and his daughter-in-law, all of whom testified that the deal was closed on November 5, that the words "Down payment on Mimosa Lake" were inserted in the receipt at respondent's request, and that nothing was said to the effect that he should have until the following Thursday to make up his mind concerning the purchase.

As to subsequent events, respondent testified as follows:

On Thursday, November 10, he went to appellant's house about 10:00 o'clock in the morning, for the purpose of telling him that he would not be able to purchase the property, and of getting his money back; but he found no one there. The next day, Friday, he went again, about 7:00 o'clock in the evening, and finding appellant at home, told him that he would not be able to take the place, and asked if he would give him back his check. Appellant made no reply, and respondent left. About a week later, respondent returned, told appellant again that he couldn't take the place and that he would like to have his check back, and asked appellant what he was going to do about it, to which the latter replied that he hadn't made up his mind, and that when he did he would let respondent know. Respondent did not see appellant again, but received a letter from him dated November 26, 1955, reading as follows:

"Dear Mr. Tate:

"I have had legal advice on the matter and have decided to consider our deal closed with your money forfeited.

"Sincerely,
"H. G. LeMaster".

Respondent admitted that on November 30, following receipt of the letter of November 26 just mentioned, he wrote to appellant as follows:

"Mr. LeMaster:
"Dear Sir:

"I received your letter today and was very much disappointed in your decision in regard to the money.

"I'm most sure you will find your legal advice is wrong. As you know I have an option on your place signed by you. It doesn't state that I have to take the place at any certain date.

"Therefore, if you refuse to give me my money back, you will not be able to sell the place.

"I told you that Saturday that I would let you know the following Thursday if I would or would not take the place.

"I came down there Thursday and no one was home so the next day (Friday) I came back and told you I would not take the place. The interest starts on that money at that date. As for legal advice, have also got that too.

"Some of your friends that you have been asking advice from are my friends, too, and they have been telling me.

"Just bear in mind I have friends also and they tell me that I offered you more than a fair proposition of which I knew. Of course, that is one thing that I always try to do.

"I considered you one of my best friends and am really hurt over the way you have done about the money.

"Am very sorry that I'm going to have to turn it over to a lawyer to handle from now on.

"J. F. Tate".

As to the events subsequent to the transaction of November 5, testimony on behalf of the appellant was as follows:

Appellant and his wife testified that they were at home on the morning of Thursday, November 10, at ten o'clock, and remained there until shortly after noon, when they went to a nearby town; and they returned about four o'clock in the afternoon. Mr. Tate did not come to their place that day at any time when they were there. They also testified that on Friday, November 11, Mr. Tate came to their home and said that he had come to tell them that he couldn't take the place because of his wife's health. On that occasion he did not ask for the return of his money, but appellant sensed that that was on his mind. About a week later respondent came back and talked with appellant, whose wife was in the next room and heard their conversation. At that time respondent said that he couldn't take the property, that it was out of the question, that he couldn't make it. According to appellant's testimony at this point, respondent did not ask for the return of his money, but appellant said to him: "Mr. Tate, you understand in a case of this sort your money is forfeited?" To this respondent replied: "Yes, I know I couldn't get my money by law. It isn't your error; it's mine, but my wife was pushing me. I do think, though, through

friendship that you ought to give me four hundred dollars back". Appellant's testimony continued:

"And I didn't see it his way, and we talked on for a while, and he went to leave, and he told me to study over it and he would come back down and see if I didn't make up my mind that I ought to give him four hundred dollars back. And I said, 'No, there ain't no use for you to come back down. I'll let you know if I decide to give it back to you'. And I came and talked to you (appellant's counsel) about it and on Sunday afterwards my son was down here and I told him to write a note and tell him that under the circumstances I had legal advice and I considered the deal closed and his money forfeited".

· Appellant's wife's recollection of the conversation was that respondent asked appellant to refund his money, and appellant replied: "Well, you realize in a case like this, when you make a down payment on a piece of property and don't take it up, and come up to your contract, that, you know, you have forfeited your money". And that respondent had said that he realized that, but did wish he would give him three or four hundred dollars back.

Respondent categorically denied that he had told appellant that he realized that he could not get his money back, and that it was his error and not that of appellant. He testified that he had told appellant, when he went to see him on Friday, November 11, that in order to avoid trouble and litigation he would be willing to let appellant keep one hundred dollars if he would return the other four hundred.

Three other witnesses testified, to wit: Audrey L. Steppe, respondent's uncle by marriage, who had accompanied respondent to the lake on Sunday, November 6, to "look around", and Boyce Chapman and his brother Curtis Chapman, who on that day were at the lake, fishing. The Chapmans testified that on that occasion respondent, in conversation with them, said that he had bought the lake, and that they could continue to fish there. Prior to their testifying, re-

spondent, on cross examination, had testified that he had seen the Chapmans there that day, but had not spoken to them. Mr. Steppe took the stand for respondent, in reply, and testified that on the occasion in question he was talking to Curtis Chapman, whom he had known for many years; that Chapman told him that the appellant had told Chapman that he was about to sell out; that Steppe then pointed to respondent, saying that he was the man who was planning to buy the place; and that Steppe then introduced Chapman to the respondent, who merely acknowledged the introduction and made no statement to the effect that he had bought the lake.

Exception 1 assigns error in allowing respondent to testify that the purpose of his going to appellant's house on Thursday, November 10, was to tell him that he would not be able to take the property, and to get his money back. There is no merit in this exception.

In the first place, neither it nor the objection interposed when the question was asked specifies the ground upon which it is contended that this testimony is inadmissible. Moreover, it seems to us that the testimony was not objectionable. A very material element of the agreement between the parties, according to respondent's testimony, was that which required him, in the event that he should decide against the purchase and wish to have his money refunded, to so notify the appellant on or before Thursday, November 10. The purpose of his visit on that day was a material fact to be proven, and it was competent to prove it by the direct testimony of the respondent himself. *McGhee v. Wells,* 57 S. C. 280, 35 S. E. 529; *Dill v. Lumbermen's Mutual Insurance Co.,* 213 S. C. 593, 50 S. E. (2d) 923.

Exception 2 charges that the trial judge erred "in allowing plaintiff's counsel to put in issue the reputation of plaintiff's employer who was not a party to this action". In the course of his cross examination of appellant's witness Curtis Chapman, respondent's counsel asked the witness if he knew the Fiske-Carter Construction Com-

pany (by whom respondent had testified that he had been employed for many years), to which the witness replied that he knew of that company. Counsel then asked: "And don't you know that is one of the most reputable firms in our county?" Thereupon appellant's counsel objected upon the ground that the matter was irrelevant; the court overruled the objection; and the question was never answered. We need not decide whether, in view of the wide latitude permitted counsel in cross examination, the question was technically objectionable; suffice it to say that even if it was, the allowance of it does not, in the circumstances, warrant reversal.

Exceptions 3 and 4, which charge, respectively, that the court erred "in allowing plaintiff's attorney to ask questions that suggested the desired answer over the objection of the defendant", and "in allowing the plaintiff's attorney to introduce new matter in his reply testimony over defendant's objection", are too general and indefinite to be considered. *Cf. State v. Jenkins,* 228 S. C. 12, 88 S. E. (2d) 770.

By Exception 12 appellant contends that the trial judge erred in charging the jury that "voluntary absence of one party from the place assigned for performance is equivalent to a refusal to perform and excuses the other party in suspending preparation for performance on his part whenever such suspension would be the natural effect or (of?) just and reasonable inference drawn by the latter from his absence and the attendant circumstances." The principle thus stated is corollary to the general rule that a party to a contract cannot avoid liability upon the ground that the other party has not fulfilled a condition precedent to such liability when he himself has prevented such fulfillment. 12 Am. Jur., Contracts, Section 329, p. 885. Appellant does not question its correctness as a proposition of law; but he contends that it was inapplicable and misleading. Under respondent's theory of the contract, return of his deposit was conditioned upon his notifying appellant on or before No-

vember 10 that he would not buy the property; and he argues that the charge complained of was pertinent to the issue of whether or not in the circumstances his failure to give such notice until the following day was justified. But actually there was no such issue. Appellant made no question of the timeliness of the notice; his position was simply that the deal had been closed on November 5. In our opinion, therefore, the portion of the charge quoted above was erroneous, but harmlessly so.

The remaining exceptions all relate to the charge, assigning error on the part of the trial judge:

(a) In failing to charge that the plaintiff's payment of deposit of $500.00 was liquidated damages (Exceptions 5 and 14);

(b) In failing to instruct the jury that no question of forfeiture was involved (Exception 13); and

(c) In charging the law with regard to forfeitures (Exceptions 6, 7, 8, 9, 10 and 11).

It is commonly stipulated in land contracts that a payment or payments made by one of the parties to the other shall be retained by the recipient in the event of default by the party making such payment or payments. Whether such a stipulation is one for liquidated damages or for a penalty is, of course, primarily a matter of the intention of the parties. Implicit in the meaning of "liquidated damages" is the idea of compensation; in that of "penalty", the idea of punishment. Thus, where the sum stipulated is reasonably intended by the parties as the predetermined measure of compensation for actual damages that might be sustained by reason of nonperformance, the stipulation is for liquidated damages; and where the stipulation is not based upon actual damages in the contemplation of the parties, but is intended to provide punishment for breach of the contract, the sum stipulated is a penalty.

If it be clear that the stipulation is for liquidated damages, breach of the contract will generally entitle the offended party to retain or recover the sum stipu-

lated, and neither more nor less, without proof of damage actually sustained; but the language used by the parties is not conclusive of the question of whether the stipulation is for liquidated damages or for penalty. *Ould v. Spartanburg Realty Co.,* 94 S. C. 184, 77 S. E. 866. And where the sum stipulated is so large that it is plainly disproportionate to any probable damage resulting from breach of the contract, the stipulation will be held one for penalty, and not for liquidated damages, regardless of its terminology. 15 Am. Jur., Damages, Section 249, p. 681; *Pembroke v. Caudill,* 160 Fla. 948, 37 So. (2d) 538, 6 A. L. R. (2d) 1395. And see annotation following the cited case, in 6 A. L. R. (2d) at pages 1402 *et seq.*

If the provision be for a penalty, recovery is measured not by the sum stipulated, but by the amount of actual damage proven to have been sustained as the result of the breach. 25 C. J. S., Damages, § 116b, p. 704.

A forfeit, or forfeiture, is "that which is lost, or the right to which is alienated, by a crime, offense, neglect of duty, or breach of contract". Webster's New International Dictionary, Second (1954) Edition. Basically, therefore, the loss by the offending party of his right to the sum deposited under a stipulation in a contract, whether the stipulation be for liquidated damages or for penalty, is a forfeiture; but as applied to such a contractual provision the words "forfeit" and "forfeiture" have long connoted "penalty", rather than "liquidated damages". It has been said that the use of the word "forfeit" indicates that the parties regarded the sum stipulated as a penalty, and, in the absence of other provisions evidencing a contrary intention, stamps the stipulation as one for a penalty rather than for liquidated damages. 15 Am. Jur., Damages, Section 248, p. 680; *Van Buren v. Digges,* 11 How. 461, 13 L. Ed. 771. But here again terminology is not a dependable guide; and intention of the parties must, in the final analysis, govern construction of the stipulation. See annotation following *Evans v. Mose-*

*ley,* 1911, 84 Kan. 322, 114 P. 374 in 50 L. R. A., N. S., 889, at pp. 890 *et seq.*

In the case at bar the trial judge, in his main charge said:

"Now, the plaintiff in this case takes the position that he paid five hundred dollars as a down payment on that purchase price, and that there was a verbal condition attached to the contract, that he was to have until Thursday following that date to make up his mind as to whether or not he would take the property. Now, the defendant in the case denies that there was any such condition attached to the contract. And he takes the position that the five hundred dollars payment was paid as a good faith binder, and was forfeited, and that there was no condition, no verbal condition, attached to the contract.

"Now, gentlemen, a contract may provide for forfeiture of an amount as liquidated damages. I say contract may provide for that. Now, it depends on what the contract was, or, as in this case, as to whether or not that is the situation here. I say as a general proposition, contracts may provide for a forfeiture or for some set amount prescribed to be forfeited in the event of noncompliance of the contract and it is a common matter for such matters to be made the subject of contract. It is a matter, of course, which depends upon the particular contract involved as to whether that be the case or not here".

Above quoted is all of the main charge stating the issues in the case and relating to the deposit or payment. It is superficial, and obviously uses the words "forfeited" and "forfeiture" in their basic meaning, without distinction as between liquidated damages and penalty. But when the trial judge, at the close of his main charge, asked if further instructions were desired, appellant did not suggest that the issues had been misstated, nor did he request amplification or clarification of the charge with respect to liquidated damages, penalty, or forfeiture. He cannot, therefore, now complain as to either of such matters. *Brown v. Hill,* 228 S. C. 34, 88 S. E. (2d) 838.

At the conclusion of the main charge, the jury having been excused, respondent's counsel requested that they be instructed as to certain rules of law applicable to forfeitures, *e. g.*, that they are not favored either in law or in equity, that every reasonable presumption is against a forfeiture, that where a contract is susceptible of two constructions that which will prevent a forfeiture should be adopted, etc. It is manifest that the propositions of law which the trial judge was thus requested to charge (and which he did charge upon the jury's return to the courtroom) dealt with the term "forfeiture" in the sense of "penalty" as distinguished from "liquidated damages". But it does not appear from the record that either during or after the discussion of them in the absence of the jury any request was made on the part of the appellant for clarification of the term, or for explanation of the distinction between liquidated damages and penalty. And by none of his exceptions does appellant contend that this distinction should have been explained to the jury, or that the charge on forfeiture as made at respondent's request was an incorrect statement of the law. The sole assignment of error under Exceptions 7, 8, 9, 10 and 11 in regard to the charge on forfeiture is that it should not have been made at all because no question of forfeiture was involved.

Exception 6 charges that the trial judge erred "in construing the five hundred dollars deposited by the plaintiff to bind the contract as a forfeiture rather than liquidated damages"; but examination of the charge as hereinbefore quoted shows that the trial judge did not construe the deposit at all, leaving it to the jury to determine what the contract between the parties was. And this exception is also without merit so far as it may relate to the supplemental charge on forfeiture, because there the trial judge merely stated abstract principles of law, the correctness of which is not challenged, and did not construe or even mention the deposit in question.

Exceptions 7, 8, 9, 10 and 11 rest upon the contention that the sum of five hundred dollars paid by respondent to appellant was, as a matter of law, a de-

posit by way of liquidated damages and not by way of penalty. The same contention is made by Exception 13, which charges error in failing to instruct the jury that no question of forfeiture was involved; and by Exceptions 5 and 14, which assign error in failing to charge that the deposit was liquidated damages. The record does not disclose that the trial judge was requested to so charge; but had such request been made he could not have done so in view of the conflicting testimony as to the terms of the agreement between the parties. When it is recalled that except for the check and the receipt, which are inconclusive as to the character of the deposit, the transaction between the parties was verbal; that in his amended answer the defendant referred to the deposit only as a forfeit; that in his letter of November 26 he again denominated it a forfeit; that there is no testimony from which it may be conclusively inferred that the sum deposited had been agreed upon by the parties as the fair measure of compensation for actual damages that might be sustained by the defendant as the result of nonperformance by the plaintiff; that nowhere in pleading or proof is the deposit expressly referred to as liquidated damages; and that the conflicting testimony indicates that the parties themselves were concerned not with regard to the technical character of the deposit, but rather with whether or not the plaintiff had the right, under their agreement, to call the deal off within five days and thereupon get his money back;—it becomes manifest that in such circumstances the trial judge could not have ruled, as a matter of law, that the deposit was liquidated damages.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.