611 S.E.2d 922

**Ben R. PITTMAN, on behalf of himself and all other shareholders of Grand Strand Entertainment, Inc., Appellant,**

v.

**GRAND STRAND ENTERTAINMENT, INC., d/b/a Legends In Concert of Myrtle Beach, John Stuart and Legends in Concert, Inc., Defendants,**

**of Whom John Stuart is, Respondent.**

No. 25969.

Supreme Court of South Carolina.

Heard Feb. 3, 2005.
Decided April 11, 2005.

C. Scott Masel, of Newby Pridgen Sartip & Masel, of Myrtle Beach, for Appellant.

Henrietta U. Golding, of McNair Law Firm, of Myrtle Beach, for Respondent.

Chief Justice TOAL.

This case was certified for review pursuant to 204(b), SCACR. The underlying litigation began when Appellant Ben R. Pittman (Pittman) brought an action against Grand Strand Entertainment, Inc., d/b/a Legends In Concert of Myrtle Beach, Respondent John Stuart (Stuart), and Legends In Concert, Inc., seeking injunctive relief and damages for misappropriation of corporate opportunity and breach of contract. The parties resolved all claims involving the corporations in arbitration. Following arbitration, however, Pittman pursued claims against Stuart as an individual. Eventually, both Pitt-

man and Stuart moved for summary judgment, and the court granted summary judgment in favor of Stuart. Pittman appeals. We affirm.

### Factual / Procedural Background

In 1994, Pittman and Stuart began making plans to open a live musical show, named "Legends in Concert," in Myrtle Beach, South Carolina. Stuart, president and sole shareholder of Legends In Concert, Inc. (Legends), a Nevada corporation, created and produced the show. Pittman, a stockbroker and entrepreneur who had an interest in the entertainment business, offered to raise the capital needed to open the show in Myrtle Beach.[1]

To raise the capital, Pittman formed a corporation named Grand Strand Entertainment, Inc. (Grand Strand). Through a public offering of stock, the corporation would raise money to open and run the show.[2] The corporation was formed in January 1995, with Pittman as its sole incorporator.

On March 26, 1995, Grand Strand and Legends entered into a licensing agreement.[3] The purpose of the agreement was to give Grand Strand licensing and intellectual property rights to produce the Myrtle Beach show, in exchange for raising capital to fund the show's opening and operation. More specifically, the agreement provided that Grand Strand would "raise between $500,000 and $1,000,000 dollars to develop, stage, open, and operate the show ... for a minimum of a one year run."

The parties signed the agreement even though it contained deadlines that were to be met *before* the date the agreement was signed. The agreement included, in part, the following terms:

---

1. The show originated in Las Vegas and had successfully opened in other cities.

2. Pittman explained that he would raise the money through a Small Corporate Offering Registration (SCOR), which is a type of public stock offering.

3. Pittman also signed the agreement as an individual. Stuart signed only on behalf of his corporation, Legends.

a) [Legends] shall commence operation in Myrtle Beach by planning, staging rehearsing and opening [the show] through supplying its own lighting, equipment and technical support, personnel, acts, talent and through accepting *preliminary cash receipts* from Grand Strand in the amount of *$200,000 on or before March 30th,* by payment of *$100,000.00 on or before March 10th* and *the balance by March 30th.*

b) Grand Strand will promptly register its SCOR offering and raise sufficient funds to complete capitalization of [the show] *which shall include all pre-production opening costs* and ongoing operating expenses, and in any event, shall not be less than $300,000.00 but is likely to be $1,000,000.00. . . .

c) Grand Strand will register the SCOR offering to finance the Myrtle Beach operation on or before June 1, 1995, in order to fully capitalize [the show] by not later than August 31st, 1995.

d) In the event that Grand Strand fails to perform or does not perform in a timely fashion, Legends shall have the right to continue to operate the Myrtle Beach production as a production of [Legends]. . . .

(Emphases added). The agreement also gave Legends the right to terminate the agreement if Grand Strand materially breached any of the terms.

Just two days after the agreement was signed, the show opened. At this time, Grand Strand had yet to pay Legends any money as outlined in the agreement. Therefore, Legends, not Grand Strand, funded all pre-production costs and was solely responsible for financing the show's opening. But according to Pittman, Stuart told him not to worry about the dates in the licensing agreement; Stuart just wanted Pittman to facilitate the SCOR in order to raise capital. In response to a conversation they apparently had about the missed deadlines, Pittman sent Stuart a fax, dated March 28, 1995, which provided as follows:

Since you have asked me not to concentrate on the $200,000 since we got the show open without it and the license was so long in the making, I will now go ahead and concentrate on the SCOR offering ASAP per you [sic] request. . . . As you

said Sunday about the license agreement when I wanted to make sure the $200,000 was not an issue ..., this is all a matter of trust and I really do trust you and hope that the same always applies to me.

The SCOR offering never occurred. Grand Strand did, however, issue Stuart 120,000 shares of stock. On April 17, 1995, a week after the stock was issued, Stuart sent a letter to the bank where Grand Strand maintained its accounts, authorizing the bank to honor drafts made by certain Legends personnel in Nevada. Stuart signed the letters as Chief Executive Officer of Grand Strand, even though he was never officially elected or named as a director or the CEO.

Finally, on April 26, 1995, Stuart sent Pittman a letter declaring Grand Strand in breach of the licensing agreement. Accordingly, Stuart terminated the agreement with Grand Strand. The letter also explained that Legends would continue operating the Myrtle Beach show, without the assistance of Grand Strand or Pittman.

In response, Pittman brought a derivative action on behalf of himself and all other shareholders of Grand Strand, seeking injunctive relief and damages for misappropriation of corporate opportunity and breach of contract. The circuit court stayed the action pending the submission of claims against Grand Strand and Legends to arbitration, as required under the licensing agreement. The court also ruled that Pittman's claims against Stuart, in his individual capacity, were not included in the arbitration agreement and thus could be pursued in an independent legal action following arbitration.

The arbitrator awarded judgment in favor of Legends on the claim for injunctive relief and dismissed all other claims. In addition, the arbitrator awarded Pittman $15,400 for services rendered and costs advanced. Finally, the arbitrator provided that "[t]his Award is in full settlement of all claims (and counterclaims) submitted by either party against the other in this arbitration."

Following arbitration, the circuit court lifted the stay, allowing Pittman to pursue his remaining claims against Stuart in his individual capacity. Stuart subsequently filed a motion for summary judgment based on res judicata and collateral estoppel, claiming that the parties agreed that all claims, including

Pittman's claims against Stuart, were to be resolved in arbitration. The court denied Stuart's motion, finding that the parties never made such an agreement.

In the action against Stuart, Pittman alleged that Stuart misappropriated Grand Strand's corporate opportunity in breach of Stuart's fiduciary duty to the corporation. Both parties filed motions for summary judgment. The master-in-equity granted summary judgment in favor of Stuart, and, in doing so, made the following conclusions of law: (1) Grand Strand breached the agreement by failing to raise the necessary funding to open and run the show; and (2) Stuart did not usurp any corporate opportunity in breach of his fiduciary obligations to Grand Strand, or otherwise fail to act in good faith. Pittman filed a motion for reconsideration, which was denied.

Pittman appeals and raises the following issues for review:

I.    Did the master-in-equity err in granting summary judgment in favor of Stuart?

II.   Did the master-in-equity err in finding that the arbitration award barred Pittman from bringing the same claims against Stuart that Pittman had previously asserted against Legends?

## LAW/ANALYSIS

### I.  SUMMARY JUDGMENT

In reviewing the grant of summary judgment, this Court applies the same standard that governs the trial court under Rule 56, SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *South Carolina Electric Gas Co. v. Town of Awendaw,* 359 S.C. 29, 34, 596 S.E.2d 482, 485 (2004) (quoting *Osborne v. Adams,* 346 S.C. 4, 7, 550 S.E.2d 319, 321 (2001)). On appeal, all ambiguities, conclusions, and inferences arising in and from the evidence must be viewed in a light most favorable to the non-moving party. *Id.*

Pittman argues Stuart owed a fiduciary duty to Grand Strand, and there is an issue of fact as to whether Stuart

breached this duty. Because we find that the parties were not in a fiduciary relationship, we disagree.

Whether there is a fiduciary relationship between two people is an equitable issue. *Hendricks v. Clemson Univ.*, 353 S.C. 449, 458, 578 S.E.2d 711, 715 (2003). A fiduciary relationship exists when one has a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith. *Hotz v. Minyard*, 304 S.C. 225, 230, 403 S.E.2d 634, 637 (1991).

Stuart did not owe a fiduciary duty to Pittman or Grand Strand. However, Pittman argues that Stuart owed a fiduciary duty because he was (1) a majority shareholder; (2) the CEO of Grand Strand; and (3) the Chairman of the Board of Directors. But Stuart did not occupy any of these positions.

First, there is no evidence that Stuart was a majority shareholder of Grand Strand. In fact, the corporate minutes describe *Pittman* as "the sole shareholder of the corporation." Although Stuart was eventually issued 120,000 shares of stock, there is no indication that by holding this stock, for which Stuart paid nothing, Stuart became a majority shareholder.[4]

Second, Pittman himself testified that there was no resolution or shareholder vote of the shareholders naming Stuart a director or officer. In fact, *Pittman* signed the corporate minutes as "Chairman." Later, in correspondence with Stuart's attorney, Pittman signed a letter as "President of Grand Strand Entertainment, Inc."

Stuart did, however, sign his name as CEO of Grand Strand on two letters that he wrote to the bank, and on a bank agreement. Although Stuart's act of signing his name as CEO may have been inappropriate, it did not transform Stuart into Grand Strand's CEO, with duties attendant to that position. We are unwilling, therefore, to find that Stuart owed duties required by officers of corporation.

At most, Pittman and Stuart, and their respective corporations, were parties to a contract, acting as two separate entities. Pittman breached that contract by not paying the $200,000 by March 30, and by not promptly registering the

---

4. Grand Strand was authorized to issue a total of 1,000,000 shares.

SCOR offering and providing all the opening costs. If any-thing, it was Pittman, not Stuart, whose actions were detrimental to Grand Strand.

Because these parties were not in a fiduciary relationship, we affirm the master-in-equity's decision granting summary judgment in favor of Stuart.

## II. CLAIM PRECLUSION

Pittman argues that the master-in-equity erred in finding that the arbitration award barred Pittman from bringing the same claims against Stuart that Pittman had previously asserted against Legends. We disagree.

Pittman misconstrues the language in the master-in-equity's ruling. In his ruling, the master found the following: "[s]ince Legends in Concert, Inc. committed no wrongs, the Plaintiff is barred from asserting any such claims against the Defendant Stuart." Pittman argues that this language effectively barred Pittman from pursuing his claims against Stuart *as an individual*. This is incorrect. The master simply reiterated what the law has been throughout this litigation: claims raised against Legends were confined to and disposed of through arbitration; therefore, Pittman was not permitted to turn around and raise those very same claims against Stuart *as an individual*. In other words, any claims Pittman has against Stuart must specifically address wrongs committed by Stuart, not Legends.

Therefore, we find no error.

## CONCLUSION

For the foregoing reasons, we affirm the master-in-equity's order granting summary judgment in favor of Stuart.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.