713 S.E.2d 318

**ERIE INSURANCE CO. as Assignee and Subrogee of Fountain Electric, Inc., Respondent,**

v.

**The WINTER CONSTRUCTION COMPANY, Appellant.**

No. 4841.

Court of Appeals of South Carolina.

Heard Dec. 7, 2010.

Decided June 15, 2011.

Rehearing Denied Aug. 12, 2011.

456

Richard J. Morgan, of Columbia and C. Walker Ingraham, of Atlanta, for Appellant.

Mason A. Summers, Francis M. Mack and Emily R. Gifford, all of Columbia, for Respondent.

WILLIAMS, J.

The Winter Construction Company ("Winter") appeals the trial court's order granting summary judgment to ERIE Insurance Company ("Erie") and finding the administrative burden provision in a subcontract is an unenforceable penalty. We reverse.

## FACTS

On March 14, 2005, Winter entered into a construction contract with Building Equity Sooner for Tomorrow Corporation ("BEST") for construction of Greenville Senior High School (the "Project"). The Project was divided into two phases. Phase 1 was comprised of a 100,000 square foot school and a 70,000 square foot addition. Phase 1 construction was intended to be completed by December 31, 2006, to accommodate students after the winter break. Phase 2, a 33,000 square foot gymnasium, was to be completed in June 2007.

On or about June 27, 2005, Winter entered into a subcontract with Fountain Electric Company, Inc. ("Fountain Electric") for all of the electrical work on the Project, with an original principal amount of $4,574,500 (the "Subcontract").[1] Winter required Fountain Electric to provide payments and performance bonds for its work from a surety acceptable to Winter. With Winter's approval, Erie provided payment and performance bonds for the full Subcontract amount.

Approximately fourteen months later, Fountain Electric defaulted on its Subcontract with Winter by failing to complete its work on the Project or pay all of its suppliers. The default occurred two months prior to the Phase 1 completion deadline. After the default, Winter sought bids from three potential replacements for Fountain Electric. Two days after the default, Winter retained the services of Metro Power, Inc. d/b/a Carolina Power ("Carolina Power") to complete the remaining electrical work. Carolina Power completed its work and the overall project was completed on time. Erie

---

1. After accounting for approved change orders and all other approved costs, the Subcontract's value rose to $5,487,727.

paid $2,799,654.80 to satisfy Fountain Electric's obligations under its Subcontract with Winter.

Fountain Electric's Subcontract included a damages provision that was triggered if Fountain Electric defaulted as set forth in Article 18.2 of the Subcontract. The provision set forth a formula to compensate Winter for its administrative burden of overseeing the completion of Fountain Electric's Subcontract (the "administrative burden") in the event Fountain Electric defaulted. The administrative burden provision states, in pertinent part:

> If SUBCONTRACTOR fails to cure an event of default within seventy-two (72) hours after receipt of written notice of default by WINTER to SUBCONTRACTOR, WINTER may, without prejudice to any of [its] other rights or remedies, terminate the employment of SUBCONTRACTOR and [ ... ] WINTER shall be entitled to charge all reasonable costs incurred in this regard (including attorney['s] fees) plus an allowance for administrative burden equal to fifteen percent (15%) to the account of SUBCONTRACTOR.

Fountain Electric's President, Terry Fountain, Jr., agreed to every provision in the Subcontract, as evidenced by his initials on every page of the Subcontract, including directly below the administrative burden.

After Fountain Electric defaulted, a total of $3,110,150.17 worth of electrical work was ultimately completed on the Project that Winter was forced to oversee and administratively manage. After its default, Fountain Electric, as required by the terms of its bond agreement with Erie, assigned all of its rights under the Subcontract to Erie, including the right of payment for all contract balances owed to Fountain Electric. Erie, as subrogee of Fountain Electric, then made a demand upon Winter for payment of all remaining contract balances that Winter owed to Fountain Electric. On November 5, 2007, Winter made payment of $236,727.98 to Erie, representing "undisputed" amounts that it owed to Erie, as subrogee of Fountain Electric. Winter withheld an additional $466,522, claiming it was entitled to withhold these remaining funds based upon the provision in the Subcontract that is at issue. After a recalculation and retainage released from the owner of the Project, Winter made a second payment to Erie, as

subrogee of Fountain Electric. To date, Winter continues to withhold $350,000 from Erie based on the provision in the contract.

After Winter's failure to make payment, Erie initiated this action by filing a breach of contract claim against Winter. Erie's complaint asserted two causes of action. First, Erie contended the liquidated damages provision included in the Subcontract constituted an unenforceable penalty under South Carolina law. Second, Erie alleged that it is entitled to attorney's fees pursuant to section 27–1–15 of the South Carolina Code (Supp.2010) based on Winter's alleged refusal to pay Erie "all amounts due." Winter timely filed its answer, denying any liability on Erie's claims.

Erie filed a motion for summary judgment on April 14, 2008, on the ground that the contractual clause at issue was an unenforceable penalty. Winter filed a cross-motion for summary judgment on both causes of action. A hearing on the parties' summary judgment motions was held on October 14, 2008. On May 26, 2009, the trial court issued an order granting plaintiff's motion for summary judgment and denying defendant's motion for summary judgment ("Order"). In granting summary judgment in favor of Erie, the trial court ruled the contractual clause Winter had relied on in withholding payment was an unenforceable penalty. The Order further held that a question of material fact existed regarding Erie's claim to attorney's fees under section 27–1–15. This appeal followed.

## STANDARD OF REVIEW

Summary judgment is proper when it is clear that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), SCRCP; *Tupper v. Dorchester Cnty.*, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997). When plain, palpable, and indisputable facts exist on which reasonable minds cannot differ, summary judgment should be granted. *Ellis v. Davidson*, 358 S.C. 509, 518, 595 S.E.2d 817, 822 (Ct.App.2004).

When reviewing the grant of summary judgment, this Court applies the same standard that governs the trial court under Rule 56, SCRCP. *Pittman v. Grand Strand Entm't Inc.*, 363

S.C. 531, 536, 611 S.E.2d 922, 925 (2005) (citing *S.C. Elec. Gas Co. v. Town of Awendaw*, 359 S.C. 29, 34, 596 S.E.2d 482, 485 (2004) and *Osborne v. Adams*, 346 S.C. 4, 7, 550 S.E.2d 319, 321 (2001)). On appeal, all ambiguities, conclusions, and inferences arising in and from the evidence must be viewed in a light most favorable to the nonmoving party. *Pittman*, 363 S.C. at 536, 611 S.E.2d at 925.

## LAW/ANALYSIS

Winter contends the trial court erred in holding the administrative burden provision in the Subcontract is an unenforceable penalty provision. We agree.

Basic contract law provides that when a contract is clear and unambiguous, the language alone determines the contract's force and effect. *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). It is not the function of the court to rewrite contracts for parties. *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 171, 568 S.E.2d 361, 363 (2002). South Carolina law allows parties to prospectively set an amount of damages for breach through the inclusion of a liquidated damages provision. *Id.* at 172, 568 S.E.2d at 363 (finding that parties to a contract may stipulate as to amount of liquidated damages owed in event of nonperformance). Such provisions are widely used in construction contracts and have been generally enforced as an appropriate remedy for breach. *See* 11 S.C. Jur. Damages § 65 (2010); Restatement (Second) of Contracts § 356 (1981).

■ The dispositive test on whether a provision in a contract is for liquidated damages or is an unenforceable penalty was set forth by our supreme court in *Tate v. LeMaster*:

Implicit in the meaning of 'liquidated damages' is the idea of compensation; in that of 'penalty,' the idea of punishment. Thus, where the sum stipulated is reasonably intended by the parties as the predetermined measure of compensation for actual damages that might be sustained by reason of nonperformance, the stipulation is for liquidated damages; and where the stipulation is not based upon actual damages in the contemplation of the parties, but is intended to

provide punishment for breach of the contract, the sum stipulated is a penalty.

231 S.C. 429, 441, 99 S.E.2d 39, 45–46 (1957); *see also Kirkland Distrib. Co. of Columbia, S.C. v. U.S.*, 276 F.2d 138, 145 (4th Cir.1960). Moreover, "[w]hether such a stipulation is one for liquidated damages or for a penalty is ... primarily a matter of the intention of the parties." *Tate*, 231 S.C. at 441, 99 S.E.2d at 45; *see also Benya v. Gamble*, 282 S.C. 624, 630, 321 S.E.2d 57, 61 (Ct.App.1984), *cert. granted*, 284 S.C. 366, 326 S.E.2d 654, and *cert. dismissed*, 285 S.C. 345, 329 S.E.2d 768 (1985). Accordingly, we look to the language of the Subcontract and the reasonable intention of the parties to determine if the liquidated damages provision was the predetermined measure of compensation.

### A. Language of the Subcontract

■■■■■ The law in this state regarding the construction and interpretation of contracts is well settled. *See Conner v. Alvarez*, 285 S.C. 97, 101, 328 S.E.2d 334, 336 (1985). When the language of a contract is clear, explicit, and unambiguous, the language of the contract alone determines the contract's force and effect and the court must construe it according to its plain, ordinary, and popular meaning. *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct.App.2004). In addition, "[w]here an agreement is clear and capable of legal interpretation, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." *Id.* (citing *Heins v. Heins*, 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001)).

At issue in the litigation is Article 18.2 of the Subcontract. The article states, in pertinent part:

WINTER shall be entitled to charge all reasonable costs incurred in this regard (including attorney['s] fees) plus an allowance for administrative burden equal to fifteen percent (15%) to the account of SUBCONTRACTOR.

The language of the Subcontract is clear. In the event of a breach, Winter would be entitled to an administrative burden to oversee the timely completion of the project. The administrative burden included in the Subcontract provision was reasonably intended by the parties as the predetermined measure of compensation for nonperformance. It is undisput-

ed that Fountain Electric's President, Terry Fountain, Jr., agreed to every provision in the Subcontract, as evidenced by his initials on every page of the Subcontract, including his initials directly below the administrative burden provision. There is no suggestion that this figure was arrived at by unfair means, or that it does not represent part of the bargained-for contract. Moreover, no evidence was presented that Mr. Fountain was an unsophisticated party or was incapable of understanding the Subcontract he signed on behalf of Fountain Electric. In fact, when the senior manager of the Project met with Mr. Fountain, he discussed the long history of Fountain Electric and noted several other projects his company was handling. The record also contains statements from Winter's Chief Financial Officer and the senior manager of the Project indicating the liquidated damages provision was meant to compensate Winter for the administrative burden if a default occurred. Accordingly, we conclude the parties agreed the stipulated sum was one for liquidated damages.

**B. Predetermined Measure of Compensation**

■■■■ The touchstone question in determining whether the sum stipulated in the Subcontract is a liquidated damage or an unenforceable penalty is whether the amount is "reasonably intended by the parties as the predetermined measure of compensation for actual damages *that might be sustained* by reason of nonperformance...." *Tate,* 231 S.C. at 441, 99 S.E.2d at 46 (emphasis added); *see also* Restatement (Second) of Contracts § 356 (1981). In *Foster v. Roach,* our supreme court identified criteria to utilize in making this determination:

> In order to determine whether the sum named in a contract as a forfeiture for noncompliance is intended as a penalty or liquidated damages, it is necessary to look at the whole contract, its subject-matter, the ease or difficulty in measuring the breach in damages and the magnitude of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach.

119 S.C. 102, 107, 111 S.E. 897, 899 (1922).

The damages that Winter and Fountain Electric might reasonably anticipate were difficult to ascertain because of the very nature of the work Fountain Electric was performing.

The Subcontract between Winter and Fountain Electric, signed on April 29, 2005, provided that Fountain Electric would complete all of the electrical work on two separate phases of the Project by June 2007 for an original principal amount of $4,574,500. At the time the parties entered into the contract, it was impossible to estimate administrative costs in the event of a default because the future costs were unknown. The very nature of a large and complex construction project such as this is what makes damages difficult to ascertain in the first place.

Due to the impossibility of determining the actual and consequential damages resulting from the subcontractor's failure to complete the work on time, the parties included a liquidated damages provision in the Subcontract to serve as a fair-measure formula that varies the recoverable damages based on the outstanding work remaining in the Subcontract. The fifteen percent administrative burden is not a pre-set amount, but instead operates as a "sliding scale," accounting for the outstanding and remaining work to be completed at the time a party defaults. The earlier a default occurs, the greater the administrative burden Winter incurs in completing the subcontractor's work. The fifteen percent administrative burden is a reasonable and fair liquidated damages provision. Winter presented uncontroverted evidence that the construction industry standard for subcontract agreements is to include a liquidated damages provision requiring the defaulting subcontractor to compensate the general contractor at least fifteen percent of the remaining subcontract value to cover any and all costs, expenses, and administrative burdens that result from the default. The senior project manager for Winter stated the administrative burden agreed to by the parties was fair, reasonable, and standard in the construction industry. Winter's chief financial officer even testified outside counsel reviewed Winter's subcontract in 2004, a year before the parties agreed to the Subcontract, with the intent of making the subcontract "more friendly to [Winter's] subcontractors." Moreover, since 1996, Winter has utilized the industry standard fifteen percent liquidated damages provision in all of its subcontract agreements. Erie has presented no evidence that the fifteen percent administrative burden assessment is not the industry standard.

Fountain Electric defaulted two months prior to the completion of Phase 1 and a total of $3,110,150.17 worth of electrical work was ultimately completed on the Project after their default. Winter's senior project manager stated that although Fountain Electric had completed seventy-four percent of the electrical work of Phase 1 on paper, the Project was not as far along as originally represented. As a result of the default, Winter was forced to inspect the work completed, determine the amount of remaining work, locate and retain supplemental forces, and administratively manage the completion of the Project. These administrative duties included, but were not limited to:

1) Determining the exact amount of electrical work completed by Fountain Electric.

2) Requesting, collecting, and analyzing bids from several other electrical vendors.

3) Overseeing Carolina Power's work utilizing four senior management officials from Winter.

4) Utilizing additional employees to determine what materials Fountain Electric abandoned on the Project site, what materials were still in storage, and what work had been correctly or incorrectly completed.

5) Transitioning and overseeing Winter employees from other projects to complete the remaining electrical work.

The liquidated damages provision exists to cover these and other intangible expenses incurred in having to manage the scope of work for the balance of Fountain Electric's Subcontract.

Pursuant to the Subcontract, Winter withheld $350,000 as its administrative burden for overseeing the completion of Phase 1 and Phase 2 of the Project. The withheld amount is actually less than the originally agreed upon fifteen percent administrative burden, and the "sliding scale" approach of the provision in question acts as a fair measure of the harm done by the subcontractor's breach. *See Kirkland,* 276 F.2d at 145 (holding a liquidated damages provision that is designed as a fair measure of the harm done by its breach is not to be treated as a penalty and is enforceable).

Erie contends the total direct expenses Winter incurred were $84,066, that the actual amount of damages is disproportionate to the $350,000 withheld, and that the administrative burden is a penalty. Erie's argument fails for several reasons. First, due to the uncertainty as to when a default may occur, South Carolina courts have repeatedly held that only when the "sum stipulated is so large that it is plainly disproportionate to *any probable damage* resulting from breach of the contract, the stipulation will be held one for penalty, and not for liquidated damages." *Tate,* 231 S.C. at 442, 99 S.E.2d at 46 (emphasis added). The sliding scale approach of the administrative burden provision ensures the sum stipulated is not disproportionate to any probable damage. Second, many of Winter's administrative expenses could not be retraced because Winter's executives assigned to the Project as a result of Fountain Electric's default were salaried employees.[2] Finally, because Winter's administrative burden generates a different damages figure in each situation depending on the remaining value of the subcontract and the exact time of default, we find the provision is in proportion to the actual damages *that might be sustained* by reason of nonperformance. *Id.* at 441, 99 S.E.2d at 46 (emphasis added). The intent of the damages provision is clear and its application is proper. Thus, as a matter both of contract interpretation and of public policy, the administrative burden provision of the Subcontract is a valid, enforceable measure of liquidated damages.

Because Erie failed to show that the liquidated damages provision is an unenforceable penalty, and the facts establish that the provision is enforceable as a matter of law, the trial court erred in granting summary judgment to Erie and in denying summary judgment to Winter.

## CONCLUSION

Accordingly, the trial court's order is

**REVERSED.**

FEW, C.J., and SHORT, J., concur.

---

**2.** Several of Winter's executives and other salaried employees were brought in to help administer the Project, but Winter did not track the additional costs, expenses, and hours of these salaried employees.