1826

Karl WOLF, Appellant v. COLONIAL LIFE AND ACCIDENT INSURANCE COMPANY, Respondent.

(420 S.E. (2d) 217)

Court of Appeals

*E. Ellison Walker*, of *Prioleau & Walker*, Columbia, *for appellant.*

*Michael H. Quinn* and *Duncan S. McIntosh of Quinn, Arndt & Manning*, Columbia, *for respondent.*

Heard Feb. 11, 1992.

Decided May 26, 1992.

*Per Curiam:*

This is a breach of employment contract case between a former employee and employer. The defendant employer (Colonial) terminated payment of vested insurance premium commissions to its former employee (Mr. Wolf) for alleged violations of the Covenants Not To Compete and Prohibited Acts sections of two employment contracts. Mr. Wolf sued Colonial to reinstate his commissions, and Colonial counterclaimed for an injunction, damages, and attorney's fees. The Circuit Court referred the case to the Master-in-Equity for final judgment and direct appeal.

The primary issue at trial was the enforceability of the Covenants Not To Compete and the Prohibited Acts sections of the employment contracts. Both provisions authorized the termination of commission payments. The Master held these sections were enforceable and upheld the termination of Mr. Wolf's commission payments. The Master also awarded costs and attorney's fees to Colonial under the Covenants Not To Compete. He did not award any damages due to a failure of proof, and Colonial does no appeal this ruling. He issued an injunction against Mr. Wolf but, as stipulated by the parties, this issue is now moot. Mr. Wolf appeals. We reverse the enforcement of the Covenants Not To Compete but affirm the enforcement of the Prohibited Acts sections.

A preliminary issue involves the Master's failure to hold a second hearing before entering final judgment. Mr. Wolf contends the Order of Reference and the parties' stipulation required the Master to hold a first hearing on the legality and enforceability of the Covenants and Prohibited Acts sections of the contracts and, thereafter, hold a second hearing on the remaining issues before entering judgment. The Master concluded these contract provisions were enforceable and, therefore, there was nothing left to be decided in a second hearing and no need for additional discovery. We agree that the Master's decision left nothing else to be decided and, therefore, affirm this portion of his order.

The operative facts are undisputed. Mr. Wolf began selling insurance in 1981 for a wholly-owned subsidiary of Colonial located in Canada. He had no insurance experienced prior to this time. In early 1983, Mr. Wolf became Colonial's Director of Training for the state of Maryland. Later that year, Mr. Wolf entered into contracts with Colonial to be a salesman and a marketing director. A marketing director recruits, trains, and oversees other salesmen, receiving a commission on policies sold by them.

In 1986, Mr. Wolf entered into the two contracts at issue in the present case: a Career Sales Representative (CSR) contract; and a Marketing Director (MD) contract. These contracts replaced Mr. Wolf's existing salesman and marketing director contracts. They appointed and authorized Mr. Wolf to operate in the territories of Maryland, Delaware, and the District of Columbia.

Colonial's primary product line is health and accident insurance. A key sales method is the "payroll deduction method," whereby an organization (employer) gives permission to an insurance company to sell its products to the organization's employees. The organization withholds premium payments from the employees' paychecks, and periodically sends one check to the insurance company for all of the withheld premium payments. Colonial is one of the market leaders in the payroll deduction sales method.

Colonial terminated Mr. Wolf's MD contract in February 1988. There is no dispute about the legality of this termination in the present case. The CSR contract remained in effect.

In March 1988, the CSR contract was amended to cover the states of Maryland, Alabama, Virginia, and Wisconsin, thereby eliminating Delaware and the District of Columbia.[1] Mr. Wolf terminated this contract in April 1988.

In March 1988, Mr. Wolf met with officials of Capitol American Life Insurance Company (Capitol) about possible employment. Capitol is a direct competitor of Colonial, specializing in health and accident insurance, and using the payroll deduction sales method. Mr. Wolf signed an agreement to be Capitol's State Manager for Maryland. He later rescinded the agree-

---

[1] The Master and the parties tried this case under South Carolina law. Accordingly, we review it under South Carolina law.

ment, because his attorney advised him it would violate the non-compete provisions of his contracts with Colonial.

In April 1988, Mr. Wolf entered an agreement with Capitol covering the states of Georgia and Florida. Under this agreement, he would sell insurance and oversee other salesmen, receiving a commission for policies sold by him and the people working under him. Mr. Wolf's activities in Georgia and Florida are the basis for Colonial's allegations that he violated the "Prohibited Acts" and "Covenant Not to Compete" provisions of both contracts. In reliance on these activities, Colonial terminated payment of commissions due Mr. Wolf under the CSR and MD contracts.

The "Prohibited Acts" and "Covenants" provisions of both contracts mirrored each other in terms of prohibited conduct. They prohibited the following post-employment conduct, among others:

1. Attempt to induce or induce other employees to terminate their agreements with Colonial.
2. Attempt to induce or induce policyholders to relinquish their policies.
3. Solicit or accept sales of competing products in any account in which Colonial has payroll deduction privileges.

There is no dispute that Mr. Wolf violated the letter of these prohibitions. Mr. Wolf, however, argues that the prohibitions are unenforceable or do no apply for several reasons.

At trial and on motion for reconsideration and amendment, Mr. Wolf argued that the Covenants Not To Compete were limited to his former territory with Colonial. The Master appeared to rule there 'was no geographic limitation in the Covenants, and he summarily denied the motion for reconsideration and amendment. On appeal, Mr. Wolf blurs this separate issue somewhat, by arguing against the Prohibited Acts sections and Covenants jointly as anti-competitive provisions. We conclude, however, that the issue is sufficiently argued for us to reach it, and we find that the Covenants are limited to Mr. Wolf's former territory with Colonial. The Covenants sections of both contracts assert that both parties agree "the geographic area described" is reasonable and necessary. The only geographic area described in ei-

ther contract is Mr. Wolf's territory with Colonial. None of Mr. Wolf's alleged misconduct occurred in this territory. Thus, we reverse the award of costs and attorney's fees, because only the Covenants Not To Compete authorized this relief.

Mr. Wolf challenges the enforcement of the Prohibited Acts sections on the following grounds:

1. There is no time or geographic limitation; the limitation to existing policyholders, employees, and accounts is not a valid substitute under the facts of this case; and the prohibitions unreasonably restrict competition and prevent a former employee from using his skills in the marketplace.
2. The sections are not limited to Mr. Wolf's customers while working with Colonial.
3. The MD and CSR contracts are unconscionable contracts of adhesion, because signing them was a prerequisite to continued employment with Colonial.

Grounds 2 and 3 are not preserved for appeal. Mr. Wolf did not raise ground 2 at trial, and he cannot raise it for the first time on appeal. *State v. Vanderbilt*, 287 S.C. 597, 340 S.E. (2d) 543 (1986). Mr. Wolf did not raise ground 3 during the trial of the case, but he did raise it during the hearing on his motion for reconsideration and amendment. This motion cannot be used to raise an issue for the first time and, therefore, the issue is not preserved for appeal. *Hickman v. Hickman*, 301 S.C. 455, 392 S.E. (2d) 481 (Ct. App. 1990). Thus, ground 1 presents the only issues before this Court.

The Master held generally that the absence of geographic and/or time limitations was not fatal, because the prohibited conduct applied to existing employees, policyholders, and payroll deduction accounts. He explicitly applied this rationale to existing policyholders and implicitly applied it to existing employees and accounts. This ruling is the critical issue in this case.

As noted by the Master, the Prohibited Acts sections are often referred to as forfeiture clauses. Such clauses are subject to the same requirements and strict analysis as covenants not to compete. *Almers v. South Carolina Nat'l Bank of Charleston*, 265 S.C. 48, 217 S.E. (2d) 135 (1975). The Master concluded the facts of this case satisfied

the five-part test set forth in *Rental Uniform Serv. of Florence, Inc. v. Dudley*, 278 S.C. 674, 301 S.E. (2d) 142 (1983). Although the Master couched his ruling on the five-part test in terms of the Covenants Not To Compete, we view his rulings as equally applicable to the Prohibited Acts sections.

*Dudley* requires the prohibitions to be necessary for the protection of the employer's legitimate interest. *Id.* at 675, 301 S.E. (2d) at 143. The Master held the prohibitions were necessary for Colonial's legitimate interest in protecting its existing business contacts, including the protection of its customers, among other things, from pirating by a former employee. Although not specified in the Master's order, we view the phrase "among other things" as including the protection of existing employees and existing payroll deduction accounts.

The Supreme Court has construed prohibitions against recruiting existing employees as prohibiting only interference with contractual relations, *i.e.*, the prohibition embodies the common law right to be free from malicious interference with contractual relations. *Oxman v. Sherman*, 239 S.C. 218, 122 S.E. (2d) 559 (1961). We similarly construe the prohibition in this case. We agree with Mr. Wolf that the evidence is insufficient to show malicious interference with contractual relations. Were this the only basis for the Master's ruling, we would be compelled to reverse. The Master, however, also relied on the separate grounds of prohibiting contact with existing policyholders and existing payroll deduction accounts, *i.e.*, prohibiting contact with Colonial's existing customers.

*Dudley* also requires that the prohibitions not be unduly harsh and oppressive in curtailing the employee's legitimate efforts to earn a livelihood. 278 S.C. at 675, 301 S.E. (2d) at 143. The Master held the prohibitions do not unduly restrict Mr. Wolf's efforts in securing employment, as shown by the stipulation that he now earns more money than he did when he left Colonial. The Master also noted that the Prohibited Acts section did not completely prevent Mr. Wolf from doing the prohibited acts. The only penalty imposed for violations was the forfeiture of commissions. Thus, the prohibitions forced Mr. Wolf to make a business decision: (1) violate the prohibitions and forfeit the commissions, taking the chance that he would earn more money by violating the con-

tract; or (b) do not violate the prohibitions, *i.e.*, do not contact existing customers, and continue to receive the commissions.

Mr. Wolf argues no evidence supports the ruling that he now earns more money, because it ignores the fact that Colonial terminated the MD contract before he left Colonial, and there is no evidence that his present income exceeds his past combined income under the MD and CSR contracts. At trial, Mr. Wolf testified that the termination of his MD contract essentially cut his income in half, but he produced no other evidence to support this assertion. There is no evidence that Mr. Wolf's present income does not exceed his past income under both contracts. More importantly, Mr. Wolf does not challenge the legality of the termination of the MD contract in this case and, therefore, his income under that contract is irrelevant to the issues in this case.

*Dudley* also requires that the prohibitions be reasonable from the standpoint of sound public policy. 278 S.C. at 675-676, 301 S.E. (2d) at 143. The Master held the prohibitions reasonably protected Colonial's legitimate interest in protecting its business contacts and trade secrets, an interest shared by all businesses. We agree.

Sound public policy generally requires the enforcement of contracts freely entered into by the parties. *Oxman v. Profitt*, 241 S.C. 28, 126 S.E. (2d) 852 (1962) (applying this principle to a covenant not to compete); *Barton v. Travelers Ins. Co.*, 84 S.C. 209, 66 S.E. 118 (1909) (although courts disfavor forfeiture clauses, they will enforce them where the clause is clear and it is violated). Mr. Wolf freely entered into the MD and CSR contracts. On appeal, he argues that enforcement of the prohibitions violates public policy, because it unreasonably restricts the information on insurance products which a Colonial customer can receive. No evidence supports this argument. Although Mr. Wolf cannot provide this information to Colonial customers, nothing indicates a shortage of other insurance agents who can make the information available to the public at large or Colonial's customers in particular. Nothing indicates Mr. Wolf has any special talents or knowledge not otherwise available to the public in general or Colonial's customers in particular, except his knowledge of Colonial's products and operations. It is this knowledge that the prohibitions legitimately seek to protect.

*Dudley* also requires that the contract containing the prohibitions be supported by valuable consideration. 278 S.C. at 676, 301 S.E. (2d) at 143. The Master held the prohibitions were supported by valuable consideration, since Mr. Wolf was "paid money, among other things, pursuant to the contracts that are the subject of this lawsuit." Mr. Wolf does not challenge this finding on appeal, so it is the law of this case. *Chan v. Thompson,* 302 S.C. 285, 395 S.E. (2d) 731 (Ct. App. 1990) (Order on Rehearing). The Master's reference to "other things" apparently included the training and information given Mr. Wolf pursuant to the contracts.

*Dudley's* final requirement is that the prohibitions be reasonably limited in operation as to time and place. 278 S.C. at 675, 301 S.E. (2d) at 143. The Master held the limitation to existing policyholders and payroll deduction accounts is a valid substitute for geographic and time limitations.

In our view, the Master ruled correctly on the five-part test of *Dudley* under the facts of this case. The only issue that merits further consideration is whether the prohibitions' limitation to existing policyholders and payroll deduction accounts is a valid substitute for geographic and time limitations.

We first consider the issue of geographic limitations. The general test is that contractual prohibitions must be geographically limited to what is reasonably necessary to protect the employer's business. Prohibitions against contacting existing customers can be a valid substitute for a geographic limitation. *Caine & Estes Ins. Agency, Inc. v. Watts,* 278 S.C. 207, 293 S.E. (2d) 859 (1982); *Oxman v. Profitt,* 241 S.C. 28, 126 S.E. (2d) 852 (1962).

Here, the geographic area is not defined in the "traditional" manner of lines on a map. Rather, the prohibition seeks to protect all existing policyholders and payroll deduction accounts. Mr. Wolf argues this protection is overbroad, because Colonial does business nationwide. This argument proves too much. The fact that Colonial does business nationwide shows that it needs nationwide protection. *Cf. Somerset v. Reyner,* 233 S.C. 324, 104 S.E. (2d) 344 (1958) (refusing to enforce state-wide territorial restriction where majority of company's business came from a local area). During his employment, Mr. Wolf obtained information about Colonial's products and sales methods that would be "useful"

to him in selling to existing policyholders or payroll deduction accounts. To the extent this information is "useful" to Mr. Wolf, it is detrimental to Colonial. We do not consider it unfair for Colonial to prohibit the use of this information or, if it is used, to not continue paying Mr. Wolf his commissions.

We now consider the issue of time limitations. In *Oxman v. Profitt*, 241 S.C. 28, 126 S.E. (2d) 852 (1962), the Supreme Court considered a forfeiture clause (insurance commissions) prohibiting the former employee from contacting existing customers. The Court held the prohibition was not void, despite the absence of any time limitation. Thus, it affirmed an order overruling the defendant's demurrer. In so ruling, the Court noted that the forfeiture clause was not a blanket prohibition against competition. It allowed competition generally and prohibited only unfair competition. Th court also noted the forfeiture clause was part of a contract deliberately entered into by persons experienced in the business. In *Dickerson v. People's Life Ins. Co. of S.C.*, 284 S.C. 356, 326 S.E. (2d) 423 (Ct. App. 1985), we held a similar provision was not void under authority of *Oxman*. We also emphasized that the forfeiture clause was not a blanket prohibition against competition; it prohibited only unfair competition.

The *Oxman* and *Dickerson* rationales apply to this case. Mr. Wolf deliberately entered into the MD and CSR contracts with Colonial. The Prohibited Acts sections are not a blanket prohibition against competition. They prohibit only the unfair competition of contacting Colonial's existing customers and using the information and training provided to Mr. Wolf by Colonial to "pirate" the customers. Moreover, this prohibition is not absolute. If Mr. Wolf wants to compete unfairly, he may do so, but Colonial does not have to continue paying him while he does it.

Mr. wolf relies on a Supreme Court opinion that appears to conflict with *Oxman* and *Dickerson*. In *Almers v. South Carolina Nat'l Bank of Charleston*, 265 S.C. 48, 217 S.E. (2d) 135 (1975), the Supreme Court made the following general statement:

> The employer is entitled to protect himself from instant pirating of his old customers as well as the good will of his business. At the same time the prior clientele is not to be

> forever insulated from competition. Therefore, some time and geographic limitation must be incorporated into the covenant.

*Id.* at 52, 217 S.E. (2d) at 137. Standing alone, this statement indicates that time limitations are a prerequisite to the enforcement of forfeiture clauses. *Almers,* however, is distinguishable on its facts, and these cases must be decided on their own facts.

In *Almers,* the employee was a bank vice-president. His employment contract provided he would forfeit his pension if he went to work for a competitor. Thus, the forfeiture clause was a blanket prohibition against competition. Here, the forfeiture clause is not a blanket prohibition; Mr. Wolf may compete, but he cannot sell to Colonial's existing customers and accounts.

In *Almers,* the employer conceded it had no valid commercial interest worthy of protection with a forfeiture clause. Colonial does not make this concession.

In *Almers,* the Court noted that "pensions have a humanitarian design both to provide economic stability and financial independence in otherwise nonproductive [retirement] years." *Id.* at 53, 217 S.E. (2d) at 137. This "humanitarian design" rationale does not apply to the case at bar. The Court also noted that the federal and state legislatures were very interested in protecting pension rights, a statement of public policy not applicable to the case at bar.

The Court premised its holding not only on the importance of pension and retirement plans, but also on an analysis of the economic injury to the employee. *Id.* at 52-53, 56-57, 217 S.E. (2d) at 37, 139. Here, nothing indicates that the prohibitions in the MD and CSR contracts prevent Mr. Wolf from earning a livelihood. In fact, the record demonstrates he is earning a livelihood.

Finally, we note that the specific holding in *Almers* was a limited one:

> . . . we hold that a forfeiture clause in a *profit or pension plan* which provides that *upon employment with a competitor* a participant is divested of rights under the plan is invalid unless it contains reasonable time and geographic limitations.

*Id.* at 56, 217 S.E. (2d) at 139 (emphasis added). The above-emphasized language distinguishes *Almers* on the present case.[2] This case does not involve a pension plan, and the forfeiture does not occur simply because the former employee go to work for a competitor.

Assuming *Almers* requires a time limitation, we would reach the same result under the facts of this case. Mr. Wolf's entitlement to post-termination commissions was limited to four and five years (at most) for the MD and CSR contracts, respectively.[3] Although the trial judge did not rule on this matter, we can affirm for any reason appearing in the record. Sup. Ct. Rule 4, § 8; see also Rule 220(c), SCACR. We conclude a four or five year limitation is not unreasonable where the contract seeks only to protect existing customers

---

[2] We recognize that *Almers* also states forfeiture clauses must have a geographic limitation. A later case, however, indicates that prohibitions linked to existing customers can be a valid substitute for geographic limitations, when the contract does not contain a blanket prohibition against competition. *Caine & Estes Ins. Agency, Inc. v. Watts*, 278 S.C. 207, 293 S.E. (2d) 859 (1982). Moreover, the *Almers* requirement of geographic limitations is distinguishable for the same reasons that we have distinguished its time limitation requirement.

[3] Under the MD contract, Mr. Wolf's right to receive post-termination commissions was limited to the number of years that the MD contract was in force on the first and last day of the calendar year. The contract gave no credit for partial years, but it gave "extra" credit to employees under contract for 10 full calendar years (15 years credit) and for 15 full calendar years (20 years or life credit, whichever is longer). Mr. Wolf's employment under his MD contracts began after January 1, 1983, and ended before December 31, 1988. Thus, his right to post-termination commissions was limited to four years (contract in force for full calendar years of 1984-1987). The calculations for post-termination commissions under the CSR contract is similar but more complicated. Mr. Wolf got one year of post-termination commissions for every full calendar year that the contact was in force and Colonial's net production for the calendar year equalled or exceeded 7,000,000 points. In addition, if Mr. Wolf wrote policies during a partial calendar year, he would receive one year of post-termination commissions if Colonial's production equalled or exceeded 7,000,000 points during the same partial calendar year. Mr. Wolf's CSR contract commenced in August 1983, so it is possible, though unlikely, that Colonial produced 7,000,000 points from August through December of 1983. Mr. Wolf terminated his CSR contract on April 1, 1988, and we view it as highly unlikely that Colonial produced 7,000,000 points in the first three months of 1988. Thus, giving Mr. Wolf the benefit of any reasonable doubt, he was entitled at most to five years post-termination commissions under his CSR contract. Accordingly, under the facts of this case, the Prohibited Acts sections effectively had time limitations of four and five years for the MD and CSR contracts, respectively, and the limitation on his post-termination employment efforts, *i.e.*, his business decision, was limited to the same time periods.

without imposing a blanket prohibition against competition and where the contract uses forfeiture rather than injunction to enforce the prohibition, *i.e.*, where the contract gives the employee the option to breach the contract and lose his commissions, or not breach the contract and continue to receive his commissions. Under either option Mr. Wolf can compete, but he must choose the scope of his competition and the consequences thereof under a contract that he signed.

To summarize, we hold under the particular facts of this case that the prohibitions against contacting existing customers and accounts are enforceable for the following reasons:

1. Mr. Wolf was an experienced insurance businessman who deliberately entered into the MD and CSR contracts.
2. The Prohibited Acts sections do not contain a blanket prohibition against competition; they prevent only unfair competition by a former employee using his knowledge of the former employer's products and operations to "work" the employer's existing customers and accounts. As such, they are reasonably tailored to protect the employer's legitimate business interests.
3. Since the remedy is forfeiture rather than injunction, Mr. Wolf has the option of breaching the contract if he concludes the business risks are acceptable to him.
4. Nothing indicates the prohibitions will or have unduly restricted Mr. Wolf's opportunities to secure gainful employment and make a living.
5. Nothing indicates the public at large will suffer any harm from enforcement of the Prohibited Acts sections. In particular, nothing indicates enforcement of the prohibitions will adversely impact on free competition in the insurance marketplace or the availability of information to the insurance-buying public.

Thus, under the facts of this case, the Master did not err in enforcing the forfeiture provisions of the Prohibited Acts sections of the contracts.

Reversed in part and affirmed in part.