738 S.E.2d 480

J. Kevin BAUGH, M.D. and Barry J.
Feldman, M.D., Respondents,

v.

COLUMBIA HEART CLINIC, P.A., Appellant.

Appellate Case No. 2010–176767

No. 5074.

Court of Appeals of South Carolina.

Heard Sept. 12, 2012.
Decided Jan. 16, 2013.
Rehearing Denied March 13, 2013.

2

4

6

A. Camden Lewis, Keith M. Babcock, and Ariail King, of Lewis Babcock & Griffin LLP, of Columbia, for Appellant.

Charles F. Thompson Jr., of Malone Thompson Summers & Ott LLC, of Columbia, for Respondents.

THOMAS, J.

Columbia Heart Clinic, P.A., appeals the trial court's final order from a non-jury trial. The trial court held (1) the restrictions on competition in agreements between Columbia Heart and the respondents are unenforceable and (2) the South Carolina Wage Payment Act entitled the respondents to unpaid compensation. We reverse.

## FACTS & PROCEDURAL HISTORY

### I. The Practice

Columbia Heart is a corporate medical practice that provides comprehensive cardiology services. Its physicians are all cardiologists, although each performs different subspecialties within that field.

J. Kevin Baugh, M.D., and Barry J. Feldman, M.D. (collectively, Respondents) are cardiologists who had been shareholders and employees of Columbia Heart since before 2000. They specialize in interventional cardiology. Interventional

cardiology is a subspecialty of general cardiology focusing on certain invasive procedures such as the implantation of medical balloons and stents to unblock arteries. Usually interventional cardiology must be performed in a hospital with capability to perform open-heart surgery in case complications arise from interventional procedures.

## II. The Agreements

When Respondents became shareholders, they each entered employment agreements that forfeited money payable to them upon termination if they competed with Columbia Heart in Lexington and Richland Counties within a year. These agreements contained no other provisions that discouraged competition, and their consideration was a compensation system attached as an exhibit.

In 2004, Columbia Heart's shareholders embarked on the construction of a new medical office building in Lexington County through a limited liability company (the LLC). The LLC was almost entirely owned by the shareholder-physicians of Columbia Heart. Columbia Heart was to be the anchor tenant, but it did not own any interest in the LLC. Each member of the LLC signed personal obligations on the project debt in proportion to their equity in the LLC. Because of (1) the investment and liabilities undertaken by Columbia Heart's shareholders as members of the LLC and (2) a recent departure of a large number of Columbia Heart physicians, Columbia Heart sought to bind its shareholder-physicians more tightly to the medical practice. Thus, in July 2004 Columbia Heart's shareholder-physicians entered into the agreements at issue (the Agreements).[1]

The Agreements contain two separate non-competition provisions, one in Article 4 and one in Article 5. Section 4.5(i) of Article 4 provides the following:

Notwithstanding any other provision in this Agreement in the event at any time during the twelve (12) month period immediately following the expiration or termination (for any reason, whether with or without Cause) of this Agreement Physician continues or commences the active practice of

---

1. Columbia Heart's non-shareholder physicians had different employment agreements than its shareholders.

medicine in the field of cardiology within a twenty (20) mile radius of any Columbia Heart office at which Physician routinely provided services during the year prior to the date of expiration or termination of this Agreement, then Physician shall forfeit any monies payable to Physician pursuant to this Section 4.5 following Physician's continuation or commencement of the practice of medicine in violation of this Section 4.5(i).

Section 5.1 of Article 5 says the following:

Physician, in the event of termination or expiration of this agreement for any reason, during the twelve (12) month period immediately following the date of termination or expiration of this Agreement, shall not Compete ... with Columbia Heart.

Section 5.2 defines specific terms "[f]or purposes of Article 5":

"Compete" means directly or indirectly, on his own behalf or on behalf of any other Person, other than at the direction of Columbia Heart and on behalf of Columbia Heart: (A) organizing or owning any interest in a business which engages in the Business in the Territory; (B) engaging in the Business in the Territory; and (C) assisting any Person (as director, officer, employee, agent, consultant, lendor, lessor or otherwise) to engage in the Business in the Territory.

"Business" is defined as "the practice of medicine in the field of cardiology." "Territory" is defined as "the area within a twenty (20) mile radius of any Columbia Heart office at which Physician routinely provided services during the year prior to the date of termination or expiration of this Agreement."

No separate monetary consideration was paid to any shareholder-physician to sign the Agreements, nor did the Agreements change the compensation system established by Respondents' prior agreements.

## III. Respondents' Departure and Ensuing Litigation

Columbia Heart opened a new office in the LLC's building in December 2005. In April 2006, Respondents left Columbia Heart in accordance with the Agreements. Ten shareholders remained.

Within a month after departing, Respondents opened a new practice, Lexington Heart Clinic, where they treated patients in cardiology and hired a number of Columbia Heart's administrative and medical support staff. Lexington Heart was on the same campus as Columbia Heart's Lexington office, separated by an approximate distance of 300 yards. Columbia Heart's physicians were rotated in pairs to work in its new Lexington office until the office closed in September 2006 because of fiscal unsustainability.

Respondents filed suit against Columbia Heart, raising a number of claims. They raised a declaratory judgment action against Columbia Heart, seeking two things: (1) a ruling that the Agreements contain unenforceable non-competition provisions and (2) injunctions to prohibit Columbia Heart from enforcing those provisions. Respondents also claimed violation of the Wage Payment Act, seeking treble damages for unpaid compensation, plus costs and attorney's fees. Columbia Heart answered and sought damages for contract and fiduciary duty counterclaims but did not seek injunctive relief.

The trial court conducted a bench trial addressing Respondents' declaratory judgment and wage payment claims.[2] It held the Agreements' non-competition provisions unenforceable and awarded Respondents unpaid compensation under the Wage Payment Act. This appeal followed.

ISSUES

1. Did the trial court err in holding the Agreements contain unenforceable non-competition provisions?

2. Did the trial court err in holding Respondents are entitled to unpaid compensation under the Wage Payment Act?

STANDARD OF REVIEW

"When legal and equitable actions are maintained in one suit, the court is presented with a divided scope of review, and each action retains its own identity as legal or equitable for purposes of review on appeal." *Wright v. Craft*, 372 S.C. 1, 17, 640 S.E.2d 486, 495 (Ct.App.2006). "The proper analysis is to view the actions separately for the purpose of determin-

---

2. Trial will proceed on the remaining actions after these claims are resolved.

ing the appropriate standard of review." *Id.* at 17–18, 640 S.E.2d at 495.

## ANALYSIS

### I. Declaratory Judgment Action

On appeal, Columbia Heart contends the Agreements' non-competition provisions are enforceable for a number of reasons. Respondents raise alternative sustaining grounds. We address these arguments in turn.

The trial court found the Agreements were supported by consideration and subject to review for whether their non-competition provisions were reasonable. The court addressed the provisions in Article 5 and Article 4 separately. It found Article 5's territory restriction was reasonable because the twenty-mile radius was necessary to protect Columbia Heart's legitimate business interests and was not unduly burdensome on Respondents' ability to earn a living. The court also found Article 5's restriction against "the practice of medicine in the field of cardiology" was not overbroad. However, the court held Article 5's prohibition of "assisting any Person … to engage in the [practice of medicine in the field of cardiology]" was unreasonable under *Preferred Research, Inc. v. Reeve*[3] and *Faces Boutique, Ltd. v. Gibbs.*[4] The court reasoned this restriction "goes beyond restricting [Respondents] from doing what they did for" Columbia Heart and would bar them from assisting any cardiology practice "in any capacity." The court thus held the restriction was not necessary to protect a legitimate interest of Columbia Heart, and it found the restriction could not be blue-penciled from the rest of Article 5. And as a result, the court struck the entire covenant as unenforceable. In tandem, the court struck the non-competition provision in Article 4 because the court found the provision was a "part of, intended to be part of, and cannot be logically separated from the consequences of violating the non-compete provisions of Article 5."

To determine the standard of review for a claim brought under the Declaratory Judgment Act, we look to the

3. 292 S.C. 545, 357 S.E.2d 489 (Ct.App.1987).

4. 318 S.C. 39, 455 S.E.2d 707 (Ct.App.1995).

main purpose of the complaint, as reflected by the character of the claims, evidence, and relief sought. *Cullen v. McNeal,* 390 S.C. 470, 481, 702 S.E.2d 378, 384 (Ct.App.2010). Respondents' declaratory judgment claim seeks a determination that the Agreements' non-competition provisions are unreasonable and an injunction. An injunction is an equitable remedy, and the interpretation of an unambiguous contract is a question of law, as is the question of whether a non-competition clause is reasonable. *Madden v. Bent Palm Invs., LLC,* 386 S.C. 459, 467, 688 S.E.2d 597, 601 (Ct.App.2010); *Preferred Research,* 292 S.C. at 547–48, 357 S.E.2d at 490. Thus, we interpret the Agreements and address necessary factual questions involving the declaratory judgment action de novo. *Milliken & Co. v. Morin,* 399 S.C. 23, 30, 731 S.E.2d 288, 291 (2012); *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976).

 "While recognizing the legitimate interest of a business in protecting its clientele and goodwill, we are equally concerned with the right of a person to use his talents to earn a living." *Sermons v. Caine & Estes Ins. Agency, Inc.,* 275 S.C. 506, 509, 273 S.E.2d 338, 338 (1980). Therefore, restrictions on competition "are generally disfavored and will be strictly construed against the employer." *Rental Uniform Serv. of Florence, Inc. v. Dudley,* 278 S.C. 674, 675, 301 S.E.2d 142, 143 (1983). Hence, they "must be narrowly drawn to protect the legitimate interests of the employer." *Faces Boutique,* 318 S.C. at 42, 455 S.E.2d at 708. Such an arrangement is enforceable only if it is (1) supported by valuable consideration; (2) necessary to protect the employer in some legitimate interest; (3) not unduly harsh and oppressive in curtailing the employee's legitimate efforts to earn a livelihood; and (4) otherwise reasonable from the standpoint of sound public policy. *Rental Uniform Serv.,* 278 S.C. at 675–76, 301 S.E.2d at 143. The arrangement must be reasonably limited "with respect to time and place," but an otherwise reasonable limitation on the solicitation of former clients can substitute for a territory restriction. *Rental Uniform Serv.,* 278 S.C. at 675–76, 301 S.E.2d at 143; *Wolf v. Colonial Life & Acc. Ins. Co.,* 309 S.C. 100, 109, 420 S.E.2d 217, 222 (Ct.App. 1992).

A. *The Agreements Are Subject to Reasonableness Review*

Columbia Heart argues the trial court erred in finding the Agreements' non-competition provisions are unenforceable. Columbia Heart contends that under *J.W. Hunt & Co. v. Davis*,[5] the non-competition provisions are not subject to reasonableness review because Respondents were two of twelve shareholders in a professional association that operates "in practice" as a partnership.[6] The trial court rejected this argument, and so do we.

In *J.W. Hunt & Co. v. Davis*, an accounting partnership sued a former partner for providing services to the partnership's clients after resigning from the partnership. 313 S.C. at 353, 437 S.E.2d at 558. The firm sought to enforce a provision in the partnership agreement. *Id.* While an earlier partnership agreement "prohibited a withdrawing partner from rendering any accounting services to the partnership's clients for a five year period," the provision in issue stated the following:

> In the event a partner ... leaves the employ of the Firm and such Partner either "directly or indirectly" within a period of three (years) of such departure from the Firm does work for former or existing clients of the Firm, such [P]artner shall pay the following as liquidated damages. . . . The meaning of "directly or indirectly" is that such Partner will not render public accounting services in any of its phases. . . .

*Id.* at 353 n. 1, 437 S.E.2d at 558 n. 1. The trial court held the provision was not subject to review for whether it was a reasonable restraint on trade. *Id.* This court agreed. *Id.* It reasoned the provision was not a "covenant not to compete" because it "neither prohibit[ed] [the withdrawing partner] from practicing public accounting for any specific period of time nor from servicing any client in any specific geographic region." *Id.* at 355, 437 S.E.2d at 559. The provision instead "allow[ed] a withdrawing partner to service former clients

---

5. 313 S.C. 352, 437 S.E.2d 557 (Ct.App.1993) (cert. denied).

6. As an alternative sustaining ground, Respondents argue Columbia Heart conceded the Agreements were subject to reasonableness review. We disagree. The issue was never conceded and is otherwise preserved.

provided the partner pays the partnership liquidated damages calculated by using a formula prescribed by [the provision]." *Id.* at 353, 437 S.E.2d at 558. The court also distinguished its circumstances from the facts of a case where our supreme court held a provision was subject to reasonableness review, *Almers v. South Carolina National Bank,* 265 S.C. 48, 217 S.E.2d 135 (1975).

In *Almers,* a vice president was covered under a profit sharing program with his employer bank. *Id.* at 50, 217 S.E.2d at 135. He had acquired an 85% vested interest in the program as he departed to work for another bank in substantially the same duties. *Id.* After he left, his former bank terminated his benefits under the program pursuant to the following provision in the plan:

> Notwithstanding anything in this Plan to the contrary, no benefit shall be paid hereunder subsequent to the date any Participant, former Participant or Retired Employee enters any employment in the State of South Carolina, if in the opinion of the Board such employment is in competition with or to the detriment of The South Carolina National Bank of Charleston.

*Id.* at 50–51, 217 S.E.2d at 136. On appeal, our supreme court acknowledged this provision was not "the classic example of a direct restraint" on competition, the "covenant not to compete." *Id.* at 51, 217 S.E.2d at 136. The court instead characterized the provision as a "forfeiture clause" and noted that "the consequence [of the clause] is not the inability to engage in competitive employment, but the forfeiture of pecuniary benefits should [the bank] . . . determine that an employee with accrued benefits had" competed against the bank. *Id.* at 52, 217 S.E.2d at 136. Despite the distinction, the court held that "a forfeiture clause in a profit or pension plan which provides that upon employment with a competitor a participant is divested of rights under the plan is invalid unless" it satisfies the same reasonableness review applied to covenants not to compete. *Id.* at 56, 217 S.E.2d at 138–39.

In rejecting the *Almers* analogy, the *J.W. Hunt* court explained the following:

> Unlike *Almers,* there is no employment relationship involved in this case. Instead, the relationship here is a

partnership agreement between partners with equal bargaining power. When Article VII was adopted in 1986, Davis formally assented to Article VII by signing the agreement. Although the partnership agreement was subsequently amended five times, Article VII remained intact. As opposed to the sole protection of an employer's interest accomplished through the forfeiture of accrued benefits in *Almers*, Article VII, a provision for which Davis bargained, afforded Davis protection against withdrawing partners from the time of the Article's adoption until Davis' withdrawal in 1990.

*Id.* at 355–56, 437 S.E.2d at 559–60 (citations omitted) (alterations in original).

██ *J.W. Hunt* does not apply to the provisions of this case. First, the Agreements are contracts of employment.

Further, the non-competition provisions in the Agreements are substantively different than the provision in *J.W. Hunt*. Unlike the provision in *J.W. Hunt*, Article 5's non-competition provision is a covenant not to compete. Section 5.1 directly prohibits certain types of competitive conduct within a certain territory for a certain period of time. None of our courts have declined to apply a reasonableness analysis to covenants not to compete, and thus, Section 5.1 is subject to reasonableness review. Like the provision in *J.W. Hunt*, Article 4's non-competition provision is not a covenant not to compete. Unlike in *J.W. Hunt*, however, Article 4's provision is a forfeiture clause. While the clause in *J.W. Hunt* required the partner to pay a certain amount upon competition, Article 4 upon competition divests Respondents' rights to "any monies payable to Physician pursuant to this Section 4.5" under the Agreements. Forfeiture clauses are generally subject to reasonableness review, and none of our courts have declined to apply a reasonableness analysis to forfeitures. *See also Wolf*, 309 S.C. at 106, 420 S.E.2d at 220 (providing forfeiture clauses "are subject to the same requirements and strict analysis as covenants not to compete") (per curiam).

### B. *Article 5's Activity Restriction Is Reasonable*

Columbia Heart also argues the trial court erred in finding Article 5's restriction against assisting a person to engage in

the practice of medicine in the field of cardiology is not necessary to protect a legitimate interest of Columbia Heart.[7]

Columbia Heart specifically contends the covenant's prohibition against assisting the practice of medicine in the field of cardiology is necessary to prevent Respondents from indirectly engaging in activities they clearly could not participate in directly. We agree.

Here, the record evidences that Columbia Heart's patients, referral sources, and other goodwill would be at risk if Respondents were able to assist others to engage in the practice of cardiology. Patients stay with and follow their doctors, and general practitioners refer patients to cardiologists based upon both the reputation of the doctor and the doctor's practice, current and past. If the Agreements did not prohibit Respondents from assisting another person to engage in the practice of medicine in the field of cardiology, Respondents could treat Columbia Heart's patients and use Columbia Heart's referral sources and goodwill simply by staying one step from the medical services provided. Therefore, the restriction is necessary to protect a legitimate interest of Columbia Heart.

Respondents maintain this case is controlled by *Preferred Research, Inc. v. Reeve* and *Faces Boutique, Ltd. v. Gibbs.* However, those cases are inapposite.

In *Preferred Research,* an attorney executed a licensing agreement to perform real estate title work and related services for a company. 292 S.C. at 546, 357 S.E.2d at 489. The agreement described the company's business as "a national service in the fields of courthouse records research and verification, title searches, title insurance commitments and policies, loan closings, real estate appraising, credit investigations, examination of records affecting title to real estate and personal property and related services." *Id.* at 548, 357 S.E.2d at 490. The agreement further provided the following:

> In the event of termination of this Agreement for any reason whatsoever, Licensee shall not thereafter engage either directly or indirectly as principal or employee, alone or in association with others, in a similar business, *in any*

---

7. No party contends Article 4's activity restriction is unreasonable.

*capacity,* to that licensed and established hereunder within an airline radius of twenty-five (25) miles of any of Licensee's places of business established under this Agreement and within the Territory described in Exhibit "B" attached hereto and by reference incorporated herein, for a period of twelve (12) months.

*Id.* at 547, 357 S.E.2d at 490. Applying Georgia law, this court held the activity restriction was broader than necessary to protect the company because it would prevent the attorney from working in any capacity for any employer who engaged in any of the activities encompassed by the company's business. *Id.* at 548, 357 S.E.2d at 490.

In *Faces Boutique,* a facial spa that provided skin care and face lifts employed the defendant, an esthetician who performed facials. 318 S.C. at 41, 455 S.E.2d at 708. The defendant's employment contract contained the following covenant:

For a period of three (3) years after the termination of this agreement, the Employee will not, WITHIN THE TOWN OF HILTON HEAD ISLAND, SC, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, advertisement or control of any business in direct competition with the type of business conducted by [Employer].

*Id.* The court held the covenant restricted the defendant's employment opportunities beyond what was necessary for the protection of the spa's legitimate business interests. *Id.* at 43, 455 S.E.2d at 708. It reasoned the owner of the spa admitted the covenant prohibited the defendant from being employed "at any place of business engaged in the selling of cosmetics or giving facials, even if [the defendant] herself did not participate in these activities" and "even though, in such a situation, [the] business would not be threatened." *Id.*

The "any capacity" restrictions employed in *Preferred Research* and *Faces Boutique* are broader than the restriction here. Article 5 only prohibits "assisting any Person . . . *to engage in* [the practice of medicine in the field of cardiology]." Assuming Respondents do not violate the other restrictions, they could work for a business that practices medicine in the

field of cardiology so long as they do not assist a person to engage in the practice of cardiology. Although Respondents do not contest that they breached the restrictions here, whether a shareholder-physician has actually assisted someone to engage in the practice of medicine in the field of cardiology could be a question of fact in other cases.

We accordingly find the trial court erred in determining the scope of activity restricted by Article 5's covenant not to compete was unreasonable. We thus must consider Respondents' additional grounds for sustaining the trial court's finding that the Agreements' non-competition provisions are unenforceable.

C. *The Agreements Are Supported by New Consideration*

Respondents contend as an additional sustaining ground that the Agreements are unenforceable because they are not supported by new consideration. We disagree.

 "[W]hen a covenant [not to compete] is entered into after the inception of employment, separate consideration, in addition to continued at-will employment, is necessary in order for the covenant to be enforceable." *Poole v. Incentives Unlimited, Inc.*, 345 S.C. 378, 382, 548 S.E.2d 207, 209 (2001). "[T]here is no consideration when the contract containing the covenant is exacted after several years' employment and the employee's duties and position are left unchanged." *Id.*

 Respondents executed the Agreements after they became employed by Columbia Heart, and the Agreements did not change the general compensation system agreed to by the parties under their prior employment contracts. However, Section 4.5(*l*) of Article 4 of the Agreements provides the following:

Physician shall be paid Five Thousand and No/100 Dollars ($5,000.00) per month for each of the twelve (12) months following termination, so long as the Physician is not in violation of Article 5 of this Agreement.

This language established that Columbia Heart promised to pay each Respondent a total of $60,000 over twelve months after termination so long as they did not violate the non-competition provision in Article 5. In Article 5, Respondents

promise not to compete with Columbia Heart, and the parameters of that promise are more restrictive than the covenants in the prior agreements. Consequently, the Agreements are supported by new consideration. *See Evatt v. Campbell,* 234 S.C. 1, 8, 106 S.E.2d 447, 451 (1959) ("Mutual promises ... constitute a good consideration.").

■ Respondents maintain Columbia Heart's promise to pay $60,000 in severance after termination was illusory because they will not receive the money if they compete in violation of Article 5. However, a promise is not illusory merely because its enforceability depends upon the performance of a reciprocal promise. Consequently, the Agreements are supported by new consideration.

### D. *Article 5's Territory Restriction Is Reasonable*

■ As a further additional sustaining ground, Respondents argue the Agreements' non-competition provisions are unenforceable because Article 5's territory restriction is unreasonable.[8] Respondents maintain the nearest medical facilities outside the territory restriction that are authorized to perform elective invasive procedures critical to their subspecialty, interventional cardiology, are 55 miles away. In other words, they argue the territory restriction would in practical effect force them to make a significant relocation in order to perform their practice. They contend the territory restriction is therefore not tied to a legitimate interest of Columbia Heart and constitutes an unduly oppressive restraint on their ability to earn a living. We disagree.

Here, the territory restriction is necessary to protect a legitimate interest of Columbia Heart. The plain terms of the restriction prohibit Respondents from competing within a 20-mile radius of Columbia Heart offices at which Respondents "routinely provided services" during the last year of their employment. At the height of its size, Columbia Heart had permanent offices in Providence Hospital, Palmetto Richland Memorial Hospital, and Lexington Medical Center, as well as clinics throughout the state. Respondents worked primarily at Columbia Heart's Lexington and Richland County offices. Although Columbia Heart receives referrals from all over

---

8. No party contends Article 4's territory restriction is unreasonable.

South Carolina, most of its physicians' patients come from the county where the physicians' main office is located. The restriction is limited to areas where Respondents primarily dealt with Columbia Heart patients, and no evidence in the record shows a large number of these patients were located within a distance significantly smaller than the 20–mile radius. *See Stringer v. Herron*, 309 S.C. 529, 532, 424 S.E.2d 547, 548 (Ct.App.1992) (holding a covenant in an employment contract unreasonable where it prohibited a veterinarian from competing against his prior veterinary medicine practice "within fifteen miles of any veterinary practice operated by the employer . . . at the time of termination of employment" because the 15 mile radius around each location overlapped with the others and reached into adjoining counties and another state despite the fact that the "overwhelming majority" of the practice's clients "lived much closer than 15 miles from at least one of the practice locations").

Further, the fact that the practical effect of the territory restriction will make it difficult for Respondents to practice their subspecialty in interventional cardiology does not indicate under our facts that the restriction is unnecessary to protect Columbia Heart's legitimate interests. *See Rental Uniform Serv.*, 278 S.C. at 676, 301 S.E.2d at 143 ("A geographic restriction is generally reasonable if the area covered by the restraint is limited to the territory in which the employee was able, during the term of his employment, to establish contact with his employer's customers."). Such an argument more appropriately addresses whether the covenant is unduly oppressive.

In this case, the territory restriction's practical effect on Respondents' practice is not unduly harsh or oppressive in curtailing their legitimate efforts to earn a livelihood. Respondents highlight *Cardiovascular Surgical Specialists, Corp. v. Mammana*[9] for their argument that the territory restriction is unreasonable because of the practical effect on Respondents' practices. There, a medical practice specializing in cardiovascular and thoracic surgery imposed a covenant not to compete that prohibited one of its surgeons from, among other things, owning, operating, or participating in cardiovas-

---

9. 61 P.3d 210 (Okla.2002).

cular or thoracic surgery for two years after termination. 61 P.3d at 213–14. Testimony indicated the prohibition would effectively bar the physician from practicing in cardiovascular and thoracic surgery within 100 miles of his former practice's location due to the remoteness of other hospitals. *Id.* at 214. The court struck the restriction because the employer testified, "It would be unlikely that if the non-compete was abided by, that someone would stay in the community for two years, not practice, and then have a viable practice at the end of two years." *Id.* The court further rejected the argument that the physician could switch to another medical specialty. *Id.*

Unlike in *Mammana*, Columbia Heart is a full-service cardiology practice, and Respondents specialized in general cardiology, with a subspecialty in interventional cardiology. While the restriction in *Mammana* prevented the physician from practicing in his field far beyond the technical terms of the provision, here Respondents can continue to practice in their field—offering cardiology services not involving interventional cardiology—outside the 20–mile radius.[10] Moreover, Respondents have not established their inability to perform interventional procedures would prevent them from having a viable practice after the one-year period. The evidence indicates board certification in interventional cardiology lasts for ten years, and Respondents' ability to obtain credentialing in that field after the one-year period would depend upon subsequent negotiations between Respondents and the hospitals at which they attempt to obtain credentialing. Consequently, Respondents have not shown the restriction would be unduly burdensome on their ability to earn a living, and the trial court did not err in finding the territory restriction in Article 5's covenant was reasonable.[11]

10. Both sides' testimony indicates that interventional procedures constitute only 5 to 10% of Respondents' time. Further, one witness testified interventional cardiology constitutes "probably three or four percent" of Respondents' income "at most." Another witness testified 90% of cardiology patients are managed medically, and less than 10% require interventional procedures each year.

11. We do not address the trial court's findings that Article 4 and Article 5's non-competition provisions were intended to operate together in all cases and were thus unenforceable because Article 5 contained an unreasonable activity restriction. We find Article 5 enforceable.

E. *Article 5 and Article 4 Are Subject to Review for Whether They Contain Penalties*

As another sustaining ground, Respondents assert the Agreements' non-competition provisions are not enforceable because they contain penalties for violation of their restrictions. We disagree.

"Parties to a contract may stipulate as to the amount of liquidated damages owed in the event of" breach. *Foreign Academic & Cultural Exch. Servs., Inc. v. Tripon,* 394 S.C. 197, 204, 715 S.E.2d 331, 334 (2011). They likewise may stipulate that a breaching party will lose a right to which the party is entitled under the agreement. *Tate v. Le Master,* 231 S.C. 429, 441–42, 99 S.E.2d 39, 45–46 (1957) (providing that parties may stipulate to the "forfeiture" of rights under a contract). However, if the stipulation is a penalty, it will not be enforced. *Foreign Academic,* 394 S.C. at 204, 715 S.E.2d at 334; *Tate,* 231 S.C. at 442, 99 S.E.2d at 46.

Whether a provision is a penalty is a question of construction and is generally determined by the intention of the parties. *Tate,* 231 S.C. at 429, 99 S.E.2d at 39. "When the language of a contract is clear, explicit, and unambiguous, the language of the contract alone determines the contract's force and effect and the court must construe it according to its plain, ordinary, and popular meaning." *ERIE Ins. Co. v. Winter Constr. Co.,* 393 S.C. 455, 461, 713 S.E.2d 318, 321 (Ct.App.2011). We must "look at the whole contract, its subject-matter, the ease or difficulty in measuring the breach in damages and the magnitude of the stipulated sum, not only as compared with the value of the subject of the contract, but in proportion to the probable consequences of the breach." *Id.* at 460, 713 S.E.2d at 322 (quoting *Foster v. Roach,* 119 S.C. 102, 107, 111 S.E. 897, 899 (1922)). Where the stipulation "is reasonably intended by the parties as the predetermined measure of compensation for actual damages that might be sustained by reason of nonperformance, the stipulation is for liquidated damages." *Tate,* 231 S.C. at 440, 99 S.E.2d at 45–46. "However, where the stipulation is not based upon con-

---

Therefore, the argument that Article 4 must fail because Article 5 fails does not apply to this case.

templated actual damages but is intended to provide punishment for breach of the contract, it is a penalty." *Moser v. Gosnell*, 334 S.C. 425, 432, 513 S.E.2d 123, 126 (Ct.App.1999). The stipulation will be deemed a penalty if it "is so large that it is plainly disproportionate to any probable damage resulting from breach of contract." *Lewis v. Premium Inv. Corp.*, 351 S.C. 167, 172, 568 S.E.2d 361, 363 (2002).

It is clear the Agreements' remedies were created in part to deter departures from the practice. However, that fact does not by itself indicate the remedies are penalties. A stipulation for breach will often serve as a disincentive to breach. Here, the probable damages caused by a shareholder-physician's competition would have been difficult to estimate at the time the Agreements were created. Although patients follow their doctors, the continuance of that relationship relies upon the uncertain actions and feelings of the patients. Further, Columbia Heart generates income through the delivery of services, and the practice's accounts receivable does not reflect what the company actually collects through those services. In this particular practice, the accounts receivable actually collected ranged between 37% and 48%. Lastly, the parties entered the Agreements knowing Columbia Heart itself planned to—and did—incur $5 million in debt to furnish its space in the LCC's Lexington building with equipment and furniture. The practice's ability to utilize these assets thus would depend upon the physicians' abilities to continue or increase services provided. As a result, the effect of a doctor's departure on a practice's business, while expected to be negative, would have been highly uncertain.

1. *Article 5's Stipulated Damages Provision Is Not a Penalty*

■■■ Article 5 provides remedies "available to Columbia Heart in the event of a breach of" the covenant. Those remedies included Section 5.4(a), a stipulated damages provision:

In the event that Physician, at his or her option, desires to practice in violation of the provisions contained in Section 5.1, Physician shall pay Columbia Heart liquidated damages in advance of practicing in violation of that Section in an amount equal to One Hundred Percent (100%) of Physician's

Income.... For purposes of this Agreement, "Physician's Income" shall mean the average W–2 compensation of physician-shareholders of Columbia Heart in the calendar year prior to the date of termination or expiration of this Agreement.

These damages are in partial restitution for the loss or damage which Columbia Heart will suffer as a result of such breach and in partial recovery of its investment in the practice of Physician, which together constitute full payment of such losses or damages. Notwithstanding anything to the contrary stated herein, payment of such liquidated damages (together with the forfeiture described in Article 4 above) will entitle Physician to practice in breach of the provisions contained in Section 5.1 without further liability to Columbia Heart for such breach.

Article 5 subsequently states:

Physician has carefully read and considered the provisions of this Agreement and agrees that the restrictions set forth herein, particularly those in Sections 5.1, 5.2, ..., and 5.4 (together with the remedy set forth in Article 4), are fair and reasonably required for the protection of Columbia Heart.

Article 5's stipulated damages provision is not a penalty. It reasonably attempted to provide a conservative estimate of damages sustained by Columbia Heart when a shareholder-physician departed and competed. The parties agreed at trial that the amount established by the average shareholder-physician's taxable income from the year before equaled roughly $591,710 and that Respondents are financially able to pay that amount. Further, Respondents' taxable income for each year was generally "six figures" less than the net revenue earned by each shareholder-physician for the practice. Because patients tend to follow their doctors, the use of a physician's W–2 income for the prior year is a logical estimate of the income to be lost by the practice when the physician leaves. The provision further contains an acknowledgment the stipulated amount reflects a portion of the damages Columbia Heart would suffer from breach. Consequently, the stipulated damages provision is enforceable. *Cf. ERIE Ins. Co.*, 393 S.C. at 461, 464, 713 S.E.2d at 321, 322 (holding the language of a contract that imposed a 15% fee to cover the

burden of overseeing completion of a project after the project's breach was reasonably intended as a predetermined measure of loss from breach because it varied the recoverable damages based upon the outstanding work).

2. *Article 4's Forfeiture Is Not a Penalty*

Article 4's forfeiture provides that if Respondents competed with Columbia Heart in violation of Article 4, they "shall forfeit any monies payable to [them] pursuant to this Section 4.5." Section 4.5(*l*) provides that upon termination, Respondents were entitled to $60,000. Section 4.5(f) provides that upon termination without cause, Respondents were entitled to:

(i) All salary earned or accrued but unpaid as of the date of [termination] [12]; and

(ii) Physician's Prorata Share of the Current Year's Actual Collection Percentage of the accounts receivable of Columbia Heart, computed on the date of termination of this Agreement.

Article 4 defined "Physician's Prorata Share" and "Current Year's Actual Collection Percentage." Those definitions indicate the shareholder-physician is entitled to a percentage of the accounts receivable earned by Columbia Heart between the beginning of the fiscal year and time of termination (the defined share of accounts receivable). The percentage of earned accounts receivable is based upon the shareholder-physician's ownership in Columbia Heart at termination and the percentage of accounts receivable actually collected by Columbia Heart in the last fiscal year.

 Section 4.6 of Article 4 provides:

Physician acknowledges that the forfeiture described in Section 4.5(i) is intended as partial restitution for the damages which Columbia Heart will suffer as a result of competition by Physician with Columbia Heart. Physician further acknowledges that such forfeiture . . ., is fair and reasonably required for the protection of Columbia Heart.

Like Article 5's stipulated damages provision, Article 4's forfeiture is not a penalty. Here, the Agreements indicate that if a shareholder-physician was to compete in violation of Article

---

12. This section states "Physician's death," but every party agrees the language is a typo.

4, Article 4 would simultaneously divest the shareholder-physician's rights to earned but unpaid salary, the defined share of accounts receivable, and the $60,000 severance pay. The defined share of accounts receivable is a formula that estimates the accounts receivable attributable to the physician until the physician left during the current year. Reviewed in that light, its forfeiture may conservatively estimate probable damage caused by a departed shareholder-physician's competition with Columbia Heart for a period equal to the amount of time the physician worked for the practice in the year he left. *See ERIE Ins. Co.,* 393 S.C. at 461, 464, 713 S.E.2d at 321, 322 (holding the language of a contract that imposed a 15% fee to cover the burden of overseeing completion of a project after the project's breach was reasonably intended as a predetermined measure of loss from breach because it varied the recoverable damages based upon the outstanding work). In contrast, the amounts reflecting earned but unpaid salary and $60,000 severance pay are not on their face related to Columbia Heart's probable loss suffered by a shareholder-physician's departure and competition. But the damages to be expected by competition are highly difficult to predict, and the Agreements involved large sums of money, sophisticated shareholder-physicians, and arm's length negotiation. Article 4 itself says the forfeiture was "reasonable" and "intended as *partial* restitution" for Columbia Heart's damages caused by competition. The money actually forfeited by each Respondent pursuant to Article 4 totaled near $240,000,[13] and the difference between the stipulated damages in Article 5 and the revenue loss Columbia Heart could expect in one year if a shareholder-physician took patients away from the practice equaled about "six figures," or $100,000.[14] Although Article 4's forfeiture would as a result divest each Respondent of items worth $140,000 more than the estimate of the net revenue each shareholder-physician might earn for the practice in serving its patients, Columbia Heart's loss of patients was not the only

---

13. Each Respondent's defined share of accounts receivable equaled around $172,000, and each Respondent sought the $60,000 severance pay and about $8,000 in earned but unpaid salary.

14. We consider Article 5's stipulated damages provision along with Article 4's forfeiture because Respondents breached the non-competition provisions of both.

foreseeable loss resulting from departure and competition by shareholder-physicians. Probable damages to Columbia Heart could include other losses resulting from the closing of an office, and no evidence allows us to conclude the $140,000 difference is an unreasonable estimate of those uncertain losses. *See* Restatement (Second) of Contracts § 356 cmt. b ("To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties."), *cited by ERIE Ins. Co.*, 393 S.C. at 462, 713 S.E.2d at 322. Considering the Agreements as a whole and the circumstances surrounding their entry—especially the millions of dollars Columbia Heart incurred in opening the new practice—the forfeiture in Article 4 could reasonably be intended to compensate Columbia Heart for part of the probable damages resulting from the shareholder-physician's departure and competition in contravention of Article 4. *See id.* § 356 cmt. b ("The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches. Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty, the easier it is to show that the amount fixed is reasonable." (citations omitted)). Consequently, the forfeiture in Article 4 is enforceable.

## II. Wage Payment Action

Columbia Heart contends the trial court erred in awarding Respondents the unpaid compensation they sought under the Wage Payment Act. We agree.

At trial, Respondents sought payment from Columbia Heart under the Wage Payment Act for compensation left unpaid after they departed from the practice. Both doctors sought amounts owed for their defined share of accounts receivable and earned but unpaid salary. Dr. Feldman sought payment

for unpaid director's fees, but Dr. Baugh did not. Respondents did not seek payment for the $60,000 severance pay.

The parties agreed that Respondents had competed in contravention of the Agreements, but the trial court held the non-competition provisions were unenforceable. Thus, the court found Respondents had not lost their rights to the above compensation by competing with Columbia Heart, and it awarded Respondents compensation for their wage payment claims. The court declined to grant treble damages or attorney's fees.

■■■■■ Actions seeking damages for a violation of the Wage Payment Act are actions at law. *Mathis v. Brown & Brown of S.C., Inc.,* 389 S.C. 299, 307, 698 S.E.2d 773, 777 (2010). In an action at law tried without a jury, the trial court's findings are conclusive on appeal when supported by competent evidence. *Id.* Accordingly, our standard of review is limited to correcting errors of law and determining whether the trial court's findings are supported by competent evidence. *Id.*

■■■■■ Under the Wage Payment Act, Respondents are entitled to recover in a civil action "all wages due" but unpaid by Columbia Heart when Respondents left the practice. S.C.Code Ann. § 41–10–50 (Supp.2012); S.C.Code Ann. § 41–10–80(C) (Supp.2012). The Act provides the trial court the discretion to award treble damages, attorney's fees, and costs as well. *Mathis,* 389 S.C. at 315, 698 S.E.2d at 781.

Under the Act, "wages" are defined as the following:

[A]ll amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract. Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.

S.C.Code Ann. § 41–10–10(2) (Supp.2012). In other words, the Act "defines 'wages' as 'all amounts . . . which are due to an employee under any . . . employment contract.' " *Dumas v.*

*InfoSafe Corp.,* 320 S.C. 188, 195 n. 4, 463 S.E.2d 641, 645 n. 4 (Ct.App.1995) (quoting § 41–10–10(2)).

Here, because the forfeiture in Article 4 is enforceable and Respondents have forfeited their rights to compensation under that article, no evidence indicates the defined shares of accounts receivable, unpaid draws, and director's fees are "due" to them under the Agreements. Accordingly, the items are not "wages" and the trial court erred in holding Respondents were entitled to them pursuant to their wage payment claims.

## CONCLUSION

We reverse the trial court's finding that the non-competition provisions in Article 5 and Article 4 are unenforceable. We also reverse the trial court's finding that Respondents were entitled to damages for unpaid director's fees, draws, and the defined share of accounts receivable under the Wage Payment Act.

**REVERSED.**

HUFF and LOCKEMY, JJ., concur.